RAY B. LUCAS, Superintendent of the Insurance Department, Appellant, v. CENTRAL MISSOURI TRUST COMPANY.—162 S. W. (2d) 569.

Court en Banc, May 5, 1942.

Rehearing Denied, June 13, 1942.

538

*Roy McKittrick*, Attorney General, *Covell R. Hewitt* and *Harry H. Kay*, Assistant Attorneys General, for appellant; *Charles L. Henson* of counsel.

542

*William T. Ragland* and *Chas. H. Mayer* for respondent; *Ragland, Otto & Potter* and *Mayer, Conkling & Sprague* of counsel.

544

■■■■ CLARK, J.—An opinion in this case, written by one of our commissioners, failed to receive a carrying vote. The case was re-assigned to the writer who wrote an opinion which also failed to receive a vote of the majority of the judges in Division One. The case was then transferred to the court en ■■■■ banc, re-argued, additional briefs filed and again assigned to the writer.

This is an action for money had and received. The finding and judgment below were for defendant and plaintiff appealed.

October 9, 1922, Ben C. Hyde, then superintendent of insurance, made an order, under Section 6283, Revised Statutes 1919, now Section 5984, Revised Statutes 1939, reducing certain insurance rates 10 per cent. The order was to become effective November 15, 1922. November 10, 1922, before the effective date of the reduction order, 155 fire insurance companies filed suit (called the review suit) in the circuit court of Cole County, attacking the validity of the reduction order. On the same day the review suit was filed, the insurance companies concerned and the superintendent of insurance entered into an agreement whereby the companies, pending the review suit, were to collect the rates in force prior to the reduction order, but it was provided that in the event the reduction was sustained, the companies would return to the policyholders the excess premium money collected. The review suit was referred; the referee found for the insurance companies; the circuit court, on December 22, 1924, approved the report and finding of the referee, and entered judgment canceling the reduction order. From this judgment the superintendent of insurance appealed, and on June 23, 1926, the judgment of the circuit court, canceling the reduction order, was reversed and the reduction order was approved. [See Aetna Insurance Company et al. v. Hyde, 315 Mo. 113, 285 S. W. 65.] The Supreme Court of the United States granted certiorari [273 U. S. 681, 47 Sup. Ct. 113, 71 L. Ed. 837] and that court, on January 3, 1928, upheld the reduction order and dismissed the certiorari writ. [See Aetna Insurance Company et al. v. Hyde, 275 U. S. 440, 48 Sup. Ct. 174, 72 L. Ed. 357.]

Shortly after the decision by the Supreme Court of the United States, the 155 insurance companies filed separate suits against Superintendent Hyde and the attorney general in the United States District Court at Kansas City, to enjoin the enforcement of the reduction order. These suits attacked the constitutional validity of

what is now Section 5984, Revised Statutes 1939. The 155 suits were heard together in the federal district court, and injunctive relief was denied April 12, 1929. [See Aetna Insurance Company v. Hyde, 34 Fed. (2d) 185.] One of the plaintiff companies in the 155 suits filed in the federal district court at Kansas City, appealed from the decision of that court to the Supreme Court of the United States and the decision of the district court was affirmed April 14, 1930. [See National Fire Insurance Company of Hartford v. Thompson, 281 U. S. 331, 50 Sup. Ct. 288, 74 L. Ed. 881.]

The insurance companies returned to the policyholders, who paid the excess premiums, the sum of $10,336,353.16, but this sum was not all that was collected in excess of the rate as fixed by the reduction order of October 9, 1922, and on February 8, 1931, Joseph B. Thompson, then superintendent of insurance, filed motion in the circuit court of Cole County, in the original review suit, to compel restitution of the balance of the premium money collected in excess of the rate as fixed by the reduction order. On May 26, 1933, the circuit court entered an interlocutory decree directing that said balance be paid into the circuit court and held by the court "subject to its further orders." The order of restitution of said balance recited:

"That a master or masters will be appointed by the court in order that such plaintiffs (insurance companies) may show what refunds, or other allowable credits, if any, they have made or are entitled to and for which they will receive credit, and judgment will be accordingly rendered; that such master or masters will allow plaintiffs to have a hearing on all of the issues regarding the amount of money due from them at this time and that such master or masters will conduct such hearings and make such investigation as directed by this court; that when each and every plaintiff has fully complied with this judgment and the other orders to be made by this court it will be fully and completely discharged from any and all liability to any one whatsoever regarding restitution; that this court will retain jurisdiction of this case to make any and all further orders which it deems necessary."

On the heels of the interlocutory judgment for restitution, the insurance companies brought prohibition directly in this court to prohibit the circuit court from enforcing the order of restitution. The contention was that "the circuit court was without jurisdiction to entertain the motion for restitution." It was held (May 3, 1934) that the circuit court did have jurisdiction to make the restitution order. [See State ex rel. Abeille Fire Ins. Co. et al. v. Sevier, 335 Mo. 269, 73 S. W. (2d) 361.]

December 14, 1934, the circuit court made two orders in the original review suit. The first of these orders recited the various orders theretofore made in the cause and substituted R. E. O'Malley, then superintendent of insurance, as movant in the motion for restitution, and the order gave directions to the insurance companies as to how and

what they should do in making restitution, and directed that each company, by February 15, 1935, deliver to the Clerk of the circuit court "a check for the amount of unrefunded moneys" and this check was to be made "payable to custodians" to be appointed by the court. And the order further recited that L. H. Cook and H. P. Lauf were appointed commissioners and custodians and charged with the duty of examining the reports and remittances required under the order, and they were authorized to pass on the correctness of the reports, etc., and, if necessary, they were authorized to hold hearings on the correctness of the reports and remittances. And, until otherwise directed, the custodians were directed to deposit "the proceeds of said checks" in the Central Missouri Trust Company, defendant in the present case.

The second order made by the circuit court on December 14, 1934, was as follows:

"Now at this day the court having before it the matter of the collection, care and disbursement of the fund arising from the order of restitution heretofore made herein, it is hereby ordered:

"1. That the Central Missouri Trust Company, the depository heretofore designated by the court, shall open an account and carry the same on the books in the following language: Circuit Court of Cole County, Missouri, Restitution Fund. Aetna Insurance Company et al. v. R. E. O'Malley, Superintendent of Insurance of Missouri, H. P. Lauf and L. H. Cook, custodians.

"2. That no moneys shall be paid out of said fund for any purpose whatsoever except upon the written order of this court, and that all such payments shall be made by check signed by the judge of this court and by the two custodians herein, and said check shall show upon its face the date of the court order authorizing the issuance of same. The signatures of both custodians shall appear at the bottom of such check and the signature of the judge of this court shall appear upon the left hand margin thereof, and unless all such signatures appear as aforesaid the said depository shall not be authorized to cash the same.

"3. The custodians are hereby directed to open and keep proper books showing the amounts received by them and from whom, and the dates of such receipts, and also showing all amounts paid out, when paid, to whom and for what purpose, which books shall be open at all times to the inspection of the court and its designated agents or officers and to the counsel in this case."

December 7, 1935, the circuit court entered its final judgment of restitution against the insurance companies in which the balance due from each company was stated. And on February 18, 1936, an order was made to the effect that the insurance companies had fully complied with the order of restitution, and the companies and their sureties were discharged "from all further obligations." The insurance

companies paid to the custodians $2,751,256.32, and this amount was deposited by them in the defendant trust company. The first deposit was for $51,739.32, and was made on December 29, 1934, and the last deposit was for $2.10, and was made August 21, 1936. The custodians, appointed by the court, returned to policyholders $100,978.14, and there was checked out of the deposited restitution funds, over the period of January 24, 1935 to and including January 31, 1938, for fees, salaries, etc., in attempting to deliver the money to policyholders, the sum of $289,789.95. Of the amount checked out for what may be called administration costs, $60,500.00 went to each of the custodians; $78,966.25 to attorneys; $67,408.50 for office salaries, clerical help; $8,884.42 for rent; $8,613.08 for furniture and fixtures; $9,184.68 for stationery and printing, and $5,927.90 for postage. The balance of administration costs was for miscellaneous and less costly items.

Plaintiff's petition is in 75 counts, each count being based upon a separate deposit. Count No. 1 contained this allegation:

"Plaintiff further states that on December 29, 1934, the defendant herein, without the consent of the superintendent of the insurance department of Missouri, wrongfully and without authority of law received ▮▮▮▮ the sum of fifty-one thousand, seven hundred thirty-nine dollars and thirty-two cents ($51,739.32) of the said money so paid to the said L. H. Cook and H. P. Lauf; that at the time defendant received said money it knew that said money belonged to the policyholders of Missouri and that the superintendent of the insurance department of Missouri was the lawful custodian thereof, and that the circuit court of Cole County, Missouri, and the said L. H. Cook and H. P. Lauf were wrongfully attempting to deposit said money with defendant and to administer said money contrary to law." Each count, except as to date and amount, contained such allegation.

October 17, 1938, George A. S. Robertson, then superintendent of insurance, by letter, demanded of defendant that the restitution money be turned over to him as such superintendent. October 22, 1938, defendant replied to the superintendent, stating the amount that had been deposited, and the amount checked out, and expressed a willingness to turn over the balance upon presentation of "a check therefor payable to you, drawn and signed conformably to the order of the depositor court accompanying the initial deposit, with respect to which you have been fully advised by our said letter of October 8th, or a further order of said circuit court directing such payment be made to you."

The present cause was filed November 6, 1938, and on November 23, 1938, defendant trust company filed motion in the circuit court, in the original review suit, asking for an order directing it to pay over to the superintendent of insurance the amount of restitution money deposited with it, less the amount paid out to policyholders and for administration costs. On the same day this motion was filed,

superintendent Robertson applied to this court for prohibition to prohibit the circuit court from making an order authorizing defendant to pay over to him any sum less than the amount of restitution money deposited. Preliminary writ was granted, and it was held (October 17, 1939) that the circuit court had jurisdiction to make an order directing defendant to pay over to the superintendent of insurance the restitution money it then had on deposit. [See State ex rel. Robertson v. Sevier, 345 Mo. 274, 132 S. W. (2d) 961.] November 20, 1939, pursuant to the mandate of the Supreme Court, the circuit court made an order directing defendant to turn over to the superintendent of insurance the amount of the restitution money then on deposit with it, and defendant, on the same day, turned over said amount, $2,360,488.23, to the superintendent of insurance.

As stated, supra, this cause was filed November 16, 1938, before the turnover to the superintendent, and in the petition judgment is asked for the total amount deposited with interest. However, plaintiff, in the brief, takes cognizance of the $100,978.14 disbursed by the custodians to the policyholders, and the amount turned over to the superintendent of insurance by defendant on November 20, 1938, and in the brief states "that in reality the action as it now stands is for the sum of $289,789.95."

Appellant contends: that the circuit court had no jurisdiction to seize and administer the fund; that portions of the court orders directing the commissioners to deposit the fund in defendant trust company indicated that the court was attempting to administer the fund and hence were void; that void orders protect no one; that defendant is presumed to know the law; that, by accepting the deposits, the relation of debtor and creditor was not created. but defendant became a trustee ex maleficio; that defendant knew the source of the fund and knew. or should have known, that the superintendent was the rightful custodian.

After this case was transferred to the court en banc, appellant filed a supplemental brief in which, for the first time, he makes the further contention that the excess premiums collected became a trust fund in the hands of the insurance companies and were impressed with such trust at the time they were paid to Cook and Lauf or into the registry of the court.

We did hold, first in Aetna Ins. Co. v. O'Malley, 342 Mo. 800, 118 S. W. (2d) 3, in June, 1938, and in later cases, that the superintendent was the rightful custodian and that the circuit court was without authority to administer the fund through custodians of its own choosing. However, an examination of the many cases involving this fund fails to disclose that we have ever held the circuit court was without power to collect this fund and keep it in the registry of the court until final adjudication of the amount due from each insurance company. Nor have we ever held that the circuit court lacked power

to order the money deposited in a bank during the process of collection.

The motion for restitution, filed by the superintendent in the circuit court on February 18, 1931, prayed "that plaintiff be required to pay into this court," etc. In State ex rel. Robertson v. Sevier, 345 Mo. 274, l. c. 279, 132 S. W. (2d) 961, decided November 7, 1939, it was admitted by the then superintendent of insurance that this fund was in the registry of the circuit court, even though on deposit in the defendant trust company, subject to the check of the circuit judge. As to a similar fund, see: State ex inf. McKittrick v. American Colony Ins. Co., 336 Mo. 406, 80 S. W. (2d) 876; American Constitution Fire Assur. Co. v. O'Malley, 342 Mo. 139, 113 S. W. (2d) 795.

As stated, this fund was not paid into the registry of the court in one lump sum. The first deposit was made on December 29, 1934, in the amount of $51,739.32 and the last deposit on August 21, 1936, in the sum of $2.10. Between those dates many deposits were made. In its judgment of December 7, 1935, the court found that certain companies owed additional amounts which they were required to pay; also that one company had paid the commissioners more than the amount of its liability and the excess was ordered refunded to it. Until December 7, 1935, there was no final judgment by the circuit court as to the amount due from any company and until February 18, 1936, there was no finding by that court that all the companies had complied with its orders by paying into court the amounts due.

We have consistently held, in several cases, that this fund was collected for the benefit of the policyholders who had paid excessive premiums, and that the superintendent was the proper custodian to make distribution to such policyholders. But we have never held that the policyholders were entitled to receive distribution as each payment was made by the companies; nor that the superintendent, as the representative of the policyholders, necessarily was entitled to receive each payment as made. In the Aetna case, 342 Mo. l. c. 814, we said the circuit court had jurisdiction to compel the companies to pay the excess premiums to the superintendent "or into court for him." We also said, at page 813: "The refunds could not be made until the court on December 7, 1935, by its final judgment in the restitution action compelled the companies to pay the excess premiums into court." In the American Constitution case, 342 Mo., l. c. 156, speaking of a similar fund, we said: "Since the court has the fund in its custody, it is its duty to protect it and see that it reaches the rightful custodian." We think the circuit court had jurisdiction to cause this fund to be paid into its registry and, until final adjudication and payment of the amounts due, had the right to cause the money to be deposited in a bank. [City of Fulton v. Home Trust Co., 336 Mo. 239, 78 S. W. (2d) 445.]

In the former opinion prepared by the writer, the Fulton case was cited, but not discussed. In his supplemental brief, appellant seeks

to distinguish that case from the instant case on the facts, but we still think it is authority for the right to deposit these funds during the process of collection. In the Fulton case a statute required a city collector to report to the city council and pay all collections into the treasury monthly. A city ordinance required the collector to make a settlement each month with the city clerk and to immediately pay into the treasury the amount found due on such settlement. It was the custom of the collector to make daily deposits to his credit as city collector of all collections during the month and then draw his check to the treasurer for the amount found due on his settlement at the end of the month. Near the end of a certain month the bank failed and the city claimed a preference for the amount then on deposit to the credit of the collector, being the collections made during the current month. The claim for preference was based upon exactly the same contentions made by the appellant in the instant case in his original brief, to-wit: "that the city collector was not the legal custodian of such funds; that the deposits were made without authority, were illegal or unlawful, and known by the officers of the bank to be so, and that a trust ex maleficio was created; second, that, if they be held to be lawful deposits, under the facts, they were received as, became and were, special deposits which the bank held as mere trustee." Division One of this court, without dissent, held against all the contentions of the city. Not only were the points of law decided in that case identical with those advanced by the appellant in his original brief in the instant case, but the facts are in many ways similar. In that case the bank officials knew that the money had been collected from the taxpayers for the benefit of, and to be turned over to, the city after settlement with the city clerk. In this case the bank officials knew that the money had been collected from the insurance companies for the benefit of policyholders and, it may be presumed, knew that it should be turned over to the superintendent of insurance for the policyholders when the court finally determined the amount due and collected the same. Neither in the Fulton case nor in this was the act of retaining the fund during the process of collection a violation of any statute. We there held that the city collector had implied power to make and the bank had the right to receive, the deposits on a creditor-debtor basis.

In West St. Louis Trust Co. v. Brokaw, 232 Mo. App. 209, 102 S. W. (2d) 792, Frank Brokaw, as next friend of Scott Brokaw, a minor, obtained and collected a judgment for $2,000.00. The circuit court made an order that the next friend deposit the money in the trust company for the minor until he should reach his majority. The money was deposited to the credit of "Frank Brokaw, trustee for Scott Brokaw" and the bank made a record that "Mr. Brokaw must have an order from the court before any withdrawals will be allowed." The bank failed and a preference was claimed for the amount of the

deposit. The St. Louis Court of Appeals, while conceding that the portion of the court's order directing the deposit was void, held that there was nothing unlawful in accepting a general deposit of trust funds and that a trust ex maleficio did not arise from the mere acceptance of such deposit.

So, then, the mere deposit of the money, without more, did not constitute the defendant trust company a trustee ex maleficio. [U. S. F. & G. Co. v. Mississippi Valley Trust Co. (Mo. App.), 153 S. W. (2d) 752; Paul v. Draper, 158 Mo. 197, 59 S. W. 77.] But the appellant says that the court was without authority to deposit the money in the names of Cook and Lauf; that that portion of the court orders of December 14, 1934, as well as the direction for the management of the fund, was void and therefore no protection to any one. To follow that argument to its final conclusion would compel us to hold that the judgment of the circuit court ordering payment to the commissioners does not protect the insurance companies, and that they still owe the balance of the money which has not reached the superintendent because they have not made payment to the right person. However, we do not think the court's orders are defective to the extent contended by appellant. The court had jurisdiction to order the money paid into its registry and, pending final adjudication, to order the money deposited in a bank. The fact that the order required the deposits to be made in the names of the commissioners, in addition to the name of the court, does not entirely invalidate the orders.

In the Aetna case, 342 Mo. 800, 118 S. W. (2d) 3, this court referred to the orders of the circuit court made on December 14, 1934, and many other orders made after that date. We there held that the orders appointing Cook and Lauf ''as custodians to distribute said fund'' and an order appointing an attorney for such custodians were void. Those were the only orders involved in that case. We there said that the orders appointing Cook and Lauf, by whatever name they were called, constituted them referees and that the orders attempting to clothe them with authority to administer the fund *after it was paid into court* was void. That portion of the orders requiring the money to be deposited was not in issue and not discussed.

Appellant says that the wording of the court orders of December 14, 1934, which orders were brought to the attention of defendant, was sufficient to show the defendant that the court intended to exceed its jurisdiction by administering the fund. The second order of December 14 has heretofore been set out. The first order is quite long and it is unnecessary to set it out in full. The effect of it was to appoint Cook and Lauf as referees (although they were erroneously called ''custodians and commissioners'') with directions to make an accounting with the various insurance companies. The order also provided that payments from the companies be deposited in a bank or invested in securities, but ''until otherwise directed shall deposit

the same in the Central Missouri Trust Company.'' The payments were deposited and the court never at any time made any order to invest the money.

Appellant says that these two orders indicate that the court was at that time attempting to seize the fund and administer it; that the defendant is presumed to know the law and therefore was bound to know ▆▆▆ that the superintendent of insurance alone had authority to administer the fund.

It probably is true that at the time these orders were made on December 14, 1934, the court, the superintendent and the defendant all believed that the court had jurisdiction to administer the fund. This court did not hold that the circuit court lacked such jurisdiction until nearly four years after such orders were made. Whether the maxim, ''that every one is presumed to know the law,'' required the defendant to anticipate our construction of the law, it is unnecessary for us to decide. Regardless of the beliefs or intentions of the parties, there was nothing in the two orders under which the deposits were made authorizing the commissioners to pay administration expenses out of the money belonging to the policyholders. The second order prescribed the manner in which the account should be carried, set out the form of checks, and required the commissioners to keep books, but said nothing about the purposes for which payments should be made. ▆▆▆ Bear in mind that the only charge against the defendant is that it illegally *received* the deposits; that charge being based upon allegations that defendant knew as a matter of law that the superintendent was the proper custodian and knew as a matter of fact that the circuit court in making the deposits thereafter intended to administer the fund.

The cases cited by appellant on this phase of the case are not in point. They are cases involving claims for preference against the assets of closed banks, based upon failure to comply with the statutory method for selecting depositories. Each of them concerns a claim for preference for the amount remaining on deposit at the time the bank closed; none of them involves the liability of the bank for money paid out by checks under orders of a court, or otherwise.

''When, however, the bank is sought to be held, not for what it has that belongs to another, but to pay that other what the bank did not retain but which still others got, the result is very different, and so ought the applicable principles to be.'' [Atlanta, etc., Ry. v. Barnes, 95 Fed. (2d) l. c. 275.]

Appellant says that when defendant honored checks for items of administration expense it had knowledge that the court was administering the fund and paying expenses out of the policyholders' money.

There is no evidence that any orders of the court for the payment of expenses were brought to defendant's attention. The agreed statement of facts shows that none of the checks, except for refunds to

policyholders, indicated the purpose for which it was drawn. But, even if it be conceded that the evidence justifies an inference that the defendant knew expenses were being paid out of the fund, such evidence is not responsive to any allegation of the petition. The petition does not charge the defendant with any wrong, negligence or irregularity in paying out the money after it was deposited. The charge is that defendant illegally received deposits of the money in the names of Cook and Lauf when it knew that it belonged to policyholders and that the superintendent was the proper custodian.

Cases cited by appellant are clearly distinguishable from the instant case on their facts. In Pile v. Bank, 187 Mo. App. 61, 173 S. W. 50, the bank received the benefit of part of the money by applying it to an overdraft. St. Charles Savings Bank v. Orthwein Inv. Co., 160 Mo. App. 369, 140 S. W. 921, and Paxton v. Gilliam-Jackson L. & T. Co., 221 Mo. App. 1101, 297 S. W 119, each was a suit against a person charged with appropriating money to his own use. In Mann v. Bank, 323 Mo. 1000, 20 S. W. (2d) 502, a bank cashier loaned to his bank a part of a trust fund under his control as trustee. In Round Prairie Bank v. Downey (Mo. App.), 64 S. W. (2d) 701, recovery was sought for money loaned to the bank, and Mo. Twp. v. Bank, 328 Mo. 868, 42 S. W. (2d) 353, was a suit for money paid to a bank. Other cases cited involve actual fraud or unjust enrichment. They are not in point. In the instant case there was no allegation or proof that the defendant trust company received or appropriated to its own use any part of the fund, nor that any part of the fund was paid to the defendant by any person who received payment from the commissioners. This is not a case of fraud or unjust enrichment, nor an effort to recover trust funds from the ultimate recipient. All the fund not paid to the superintendent was paid out to others on checks in accordance with the contract of deposit. None of it was retained by defendant trust company for its own use. Under such circumstances we do not think the doctrine of constructive trusts applies. [3 Bogert, Trusts and Trustees, page 1451, sec. 471; In re West of St. Louis ▮▮▮ Trust Co. v. Brokaw, 232 Mo. App. 209, 102 S. W. (2d) 793; U. S. F. & G. Co. v. Mississippi Valley Trust Co. (Mo. App.), 153 S. W. (2d) 752.]

Since this case was lodged in this court, en banc, the appellant makes the contention, not contained in his former briefs, that the excess premiums constituted a trust fund in the hands of the insurance companies and was impressed with such trust at the time they were paid to Cook and Lauf or into the registry of the court. No such theory was advanced in the trial court either in the proceeding to compel restitution or in the instant case. The motion for restitution was based on the theory that the insurance companies had not completely paid back to the policyholders the excess premiums they had collected and that they still owed an undetermined balance. The

motion, in effect, asked the circuit court to determine the amount of this balance and to require the companies to pay it into court. The motion did not seek to impress a trust, but to collect a debt.

Many briefs have been filed in this case. In the last one, filed since the argument en banc, appellant elaborates an argument made in somewhat different form in his previous briefs to the effect that the title to the fund passed to the policyholders immediately upon its payment into court, citing a number of cases. We deem it unnecessary to review these cases except to say that they do not decide the question of the court's right to deposit such funds in a bank. They do, however, treat such payments into court as being in custodia legis. In the instant case the superintendent of insurance never claimed or demanded the fund during the period of nearly two years it was being paid into court. The only question before us is as to the court's right to make deposit in bank of the money in its registry. Even if the deposits were trust funds and known to be such by the bank, that fact alone would not create a trust relation as between the bank and depositor. [9 C. J. S., sec. 275, p. 575; Fred A. Boswell Post v. Farmers State Bank (Mo. App.), 61 S. W. (2d) 761.]

Respondent cites, among other reasons for sustaining the judgment rendered in its favor by the lower court, Section 5458, Revised Statutes Missouri 1929 [Mo. Stat. Ann., sec. 5458, p. 7655] now Section 8062, Revised Statutes Missouri 1939. That statute requires that a person claiming a deposit, standing on the books of a trust company in the name of another, to either procure a restraining order or indemnify the trust company. Respondent argues that, as the superintendent knew the manner in which the deposit was being carried and administered and failed to comply with the statute or to make any claim whatever, he is barred from maintaining this suit. It is unnecessary for us to pass upon this contention. However, this statute is one indication of the State's solicitude for the solvency of banking institutions. The banking business is coupled with great public interest. It is subject to strict regulation, visitation and supervision. Ordinarily a bank or trust company acting as depository of funds in court may safely rely upon the court's orders, without the necessity of employing counsel to pass upon the validity of each order. Otherwise it would be unsafe for banks to act as such depositories.

"The order of court, although directing payment to a person not entitled thereto, is an absolute protection to the custodian, and this is true, even in case the order was fraudulently procured, if the custodian had nothing to do with its procurement." [18 C. J., p. 778, sec. 50.]

"Banks are in effect fiscal agents of the government. They are essential to the business interests of our state. They operate under government supervision. The public has a keen interest in their successful operation and in their facilities for public service. They

aim to afford the public a safe place for the keeping of one's money. While regulation must be and is strict and exacting, unreasonable and unjust rules inconsistent with the efficient and safe conduct of the bank are not to be imposed.'' [Rodgers v. Bankers' National Bank, 179 Minn. 1. c. 203.]

Under the proof we do not think the defendant trust company acted illegally in accepting the deposit of this fund. Therefore, the relationship of debtor and creditor arose and, in the absence of allegation and proof of fraud (actual or constructive) or of unjust enrichment in the handling of the account, the defendant is not liable and the judgment should be affirmed. It is so ordered. *Leedy* and *Tipton, JJ.*, concur; ▮ *Douglas* and *Ellison, JJ.*, concur in separate opinions; *Hays, J.*, dissents in separate opinion; *Gantt, C. J.*, dissents.

▮ DOUGLAS, J. (concurring).—I concur in the principal opinion written by CLARK, J. It reaches the correct conclusion under the facts before us.

The facts of this lawsuit can be stated in simple language. In 1922 the Superintendent of Insurance ordered a ten per cent reduction in the cost of fire insurance. The insurance companies went to law to contest this order. While their suit was going through the courts the companies collected the old rate, including the ten per cent, but agreed to pay back this ten per cent to the policyholders if they lost their case. After they lost their case they paid back this ten per cent to some of the policyholders, but not to all. Then the Superintendent went to the circuit court to make the companies pay up what was left. He filed there a motion to compel the companies to pay *into the circuit court* the amount they had not refunded to the policyholders.[1] The circuit court granted the Superintendent's request and ordered the companies to *pay into court* the balance still in their hands and appointed masters to find out how much each company still owed.[2] Then the companies, one by one, submitted their records to the masters and paid up what they owed. As this money was paid, the circuit court had it deposited in the defendant bank. The circuit court made an order on the bank that the money should be deposited in the name of the court. The circuit court also ordered that the bank could not pay out any of this money unless the circuit court ordered it to do so. The bank paid out no money except on the order of the circuit court. Then the circuit court paid the policyholders, paid the expenses of doing this and turned over the rest of the money to the Superintendent.

By this lawsuit, as it now stands, the Superintendent seeks to force the bank to repay him out of the bank's own money the same amount

[1]Aetna Ins. Co. v. O'Malley, 342 Mo. 800, 118 S. W. (2d) 3, 1. c. 8 and 9.
[2]State ex rel. Abeille Fire Ins. Co. v. Sevier, 335 Mo. 269, 73 S. W. (2d) 361, 1. c. 370.

of money which the circuit court has spent out of the fund for expenses in distributing the refunds to the policyholders. At the beginning of this lawsuit the Superintendent claimed the bank should repay him the entire amount of money which the bank had already paid out on order of the circuit court, even including the amount of money received by the policyholders. But now there is no complaint about the money paid out of the fund to the policyholders. Nor is there now any complaint about the balance of the fund paid on order of the circuit court to the Superintendent. The only complaint is about the money which was paid out of the fund on the order of the circuit court for the expenses which were incurred by the circuit court.

The Superintendent says that the bank should not have made any payments at all out of the deposit, even though the circuit court ordered the payments, for the reason the bank did not have the right to receive the deposit of the money in the first place. I think the bank did have the right to receive the deposit ordered by the circuit court. Of course, if the circuit court had the right to deposit this money in the bank, then the bank can be guilty of no wrong in receiving the deposit of the money. Let us look at the record. The Superintendent asked that the money be paid into the circuit court. The circuit court, by its judgment, ordered the money paid into court. This is a proper procedure where an accounting is made.[3] Then as the circuit court received the money it was duty-bound to give it the same protection that a prudent business man gives his own money. That is common sense. That is what the circuit court did. The rule is expressed, "A trustee who would continuously keep for any length of time a large sum of money about his person or in his house, rather than deposit it for safe keeping in a solvent and reputable bank or trust company, where all precautions may be exercised for its safety, might justly be regarded as derelict in duty."[4]

The Superintendent also says the bank had no right to take the circuit court's deposit because the bank knew at the time ▮▮▮ of the deposit the circuit court was going to distribute the money to the policyholders to whom it belonged. The Superintendent sometime later claimed that he, instead of the circuit court, should have been the one to pay the money back to the policyholders. Still the Superintendent never claimed this when the deposit was made. Neither he nor any one else objected to the circuit court ordering the money deposited in the bank. He kept still. Yet he now says that the bank did not at the time accept the court deposit in good faith. It is true the Supreme Court decided later that the Superintendent was the proper party to have paid back the money to the policyholders, but

[3] 18 Corpus Juris, "Deposits in Court," sec. 10.
[4] 26 Ruling Case Law, p. 1314. Also see Bogert, Trusts and Trustees, sec. 598; Scott on Trusts, sec. 180.

that was several years after the deposit was made and the money paid to the policyholders by the circuit court. Will anyone say that the bank should not have obeyed the orders of the circuit court when they were made because the Supreme Court later on came to this decision? But that is what the Superintendent now says. How could a circuit court ever safeguard money by putting it in a bank if the bank did not have to pay it back when the court ordered it? Under all these facts the bank not only had the right but the duty to obey the orders of the circuit court. There is nothing in this case which shows misconduct or bad faith on the part of the bank. Therefore, the Superintendent is not entitled to a judgment against the bank and the judgment in favor of the bank should be affirmed. *Leedy, Tipton, Clark* and *Ellison, JJ.,* concur.

ELLISON, J. (concurring).—The facts are well covered in the principal opinion of CLARK, J., and succinctly summarized in the concurring opinion of DOUGLAS, J. As stated therein, this action for money had and received involves about $290,000 out of a fund of $2,751,256.-32, compulsorily paid into the circuit court of Cole County by 155 insurance companies in the Aetna *restitution* proceeding.[1] This fund represented the disputed portion of the premiums collected by the companies during the pendency of prior unsuccessful litigation to review an order reducing fire insurance rates.[2] Under a statute effective throughout most of this rate litigation the companies were permitted to collect the original rate pendente lite, but were required *to deposit the disputed portion of premiums with the Superintendent* awaiting the result of the review. The companies ignored the statute. It is now Sec. 5985, R. S. 1939, sec. 5874, Mo. Stat. Ann., p. 4482, and is the basis of the instant action.

In the *restitution* proceeding aforesaid the circuit court on December 14, 1934, entered two general orders: one appointing two commissioners and custodians, Messrs. Cook and Lauf, to verify collections from the insurance companies and to deposit the money; the other appointing the respondent Trust Company (hereinafter called the bank) as depositary and prescribing the style of the bank account and the form and signatures for checks thereagainst. These orders also disclosed that the circuit court contemplated making *disbursements* from the fund instead of turning all of it over to the Superintendent. During the next 20 months the whole restitution fund, aforesaid, was collected and deposited in the bank. The companies made 77 separate payments on 76 different dates to the clerk of the court, who turned them over to the two custodians, and they deposited the money in the bank. Final judgment was entered December

[1] Aetna Ins. Co. v. Hyde, 327 Mo. 115, 34 S. W. (2d) 85; State ex rel. Abeille Ins. Co. v. Sevier, 335 Mo. 269, 73 S. W. (2d) 361.
[2] Aetna Ins. Co. v. Hyde, 315 Mo. 113, 285 S. W. 65.

7, 1935, and the companies were discharged February 18, 1936. Throughout this period also, substantial disbursements were made from the fund by court order, for monthly salaries to the custodians and their attorney and for clerk hire, auditing, office rent, refunds to insurance companies and policyholders. No complaint was made by the Superintendent about any of these so far as this record shows.

But on March 3, 1936, after the foregoing had transpired, the court entered orders allowing the two custodians a fee of $40,000 each, and their attorney $30,000, together with further monthly salaries of $500 to each. The Superintendent appealed from those orders, and in the Aetna fee case[3] decided June 17, 1938, this court held the orders were void because the circuit court had *exceeded* its jurisdiction in making them, since the statute, Sec. 5985, supra, vested the sole power of *disbursing* the fund in the Superintendent. Our mandate went down September 20, 1938. Following that, on October 17, the Superintendent made a written demand on the bank for the whole amount deposited, and a month later brought the instant suit. Thereafter this court forced the Superintendent to accept from the bank $2,360,502.11 of the fund which it then had on deposit.[4] Of the remaining $391,000 (about) which had been disbursed on court orders, substantially $101,000 had been distributed to policyholders, and the appellant Superintendent's brief states he seeks no recovery for that. Thus it is that the suit now involves only $290,000. But the Superintendent also claims interest on the whole fund for so long as the bank had it.

The Superintendent's petition charges that the bank "wrongfully and without authority of law *received*" each of the 76 deposits, without the consent of the Superintendent, knowing: the money belonged to the policyholders; that the Superintendent was the lawful custodian thereof; and that the circuit court and the two custodians were wrongfully attempting to deposit and administer the fund, contrary to law. The legal theory of the Superintendent, and his counsel, the Attorney General's office, is that since Sec. 5985, supra, requires insurance *companies* in a *review* proceeding to deposit the disputed portion of premiums with the Superintendent, therefore the *circuit court* must do the same thing in a *restitution* proceeding brought to compel such companies to disgorge premiums which they failed to deposit with the Superintendent. It follows from this, they say, that the court orders of December 14, 1934, appointing the two custodians and the bank as depositary, and the deposit of the money therein, all were void; and that the circuit court should have turned over the money to the Superintendent in dribbles as it was received from the companies. They further assert the bank was chargeable with *constructive* notice of the foregoing legal propositions and is liable as a

---

[3]Aetna Ins. Co. v. O'Malley. 342 Mo. 800, 814(5), 118 S. W. (2d) 3, 9(8).
[4]State ex rel. Robertson v. Sevier, 345 Mo. 274, 132 S. W. (2d) 961.

trustee ex maleficio, although all the money now in dispute in this case had been paid out by the bank on court orders well before the Aetna *fee* case was decided.

Two main questions are presented in the case: (1) are the foregoing contentions of the Superintendent correct, and is he right in saying the money was *wrongfully* received by the bank; (2) conceding the bank's reception and disbursement of the money were illegal because the circuit court's orders therefor were void, was the bank nevertheless legally protected in honoring the checks against the fund because it was a judicial depositary acting under court orders; or is the bank *personally* liable for the court's jurisdictional error in making those orders? This concurring opinion deals principally with the second issue.

But before proceeding to that, a word on the first issue. In my view the principal opinion of CLARK, J., clearly demonstrates the money was *not* wrongfully received by the bank. It was paid into court by the companies in the course of the restitution proceeding, which was exactly what the Superintendent *prayed* in his motion in that case. The Aetna *fee* case expressly conceded the circuit court had jurisdiction of the subject matter and the parties in the *restitution* proceeding,[5] as had been ruled twice before.[6] That fact is not disputed by anybody now. It also held by necessary effect that the circuit court had jurisdiction of the restitution fund, itself. In five different places the opinion declared the fund was in the registry of the court, or that the court had jurisdiction to order the money paid into court (342 Mo. l. c. 808, 813, 814, 819, 118 S. W. (2d) l. c. 5, 9, 12.) And is it not obvious that in any restitution case the court not only has a right to receive and retain, but ordinarily must retain, control of the fund until final accounting and judgment, and sometimes even afterward.

With 155 insurance companies involved in the restitution case below; with the money coming in in numerous irregular payments large and small, and with the accounts changing, or likely to change, what else could it do? The final judgment of December 7, 1934, shows that one insurance company had been sued in a separate suit; that two companies had failed and become insolvent; that the accountings made by two companies had included those due from five others; and that one company was entitled to a refund of $2990.70. As it was, the court exacted $200,000 to cover "errors and omissions." Undoubtedly it had the right to settle accounts before surrendering the money—especially since no one was asking for the latter. And this is true regardless of the fact that the court collaterally had in active contemp-

---

[5] Aetna Ins. Co. v. O'Malley, 342 Mo. l. c. 814(5), 118 S. W. (2d), l. c. 9(8).
[6] In the Aetna *restitution* case, supra, 327 Mo. 115, 34 S. W. (2d) 85, and the Abeille case, supra, 335 Mo. 269, 73 S. W. (2d) 361, the latter opinion having been written by the late Judge William F. Frank who also wrote the Aetna *fee* case.

lation conduct violative of the statute—the attempted distribution of the fund, as subsequently held void in the Aetna fee case. It was the *act* of the court in excess of its jurisdiction that was wrong, in ordering the fee payments to the two custodians and their attorney; and not any lack of jurisdiction over the subject matter, the parties or the fund. It had the right to deposit the money in a bank while it was exercising its jurisdiction. If that was all that had been done this case would never have been heard of.

Turning now to the other and broader issue: whether the bank is *personally* liable for the money paid out, and for the *trial court's* jurisdictional errors in ordering its disbursement; or whether the contrary is true, that the bank was legally protected in honoring the checks because it was a judicial depositary acting only under the court's orders, notwithstanding those orders were void. In this connection it should be stated: there was no proof or contention below of actual fraud, collusion or conspiracy on the part of the bank; and no contention or proof of unjust enrichment, in the sense that the bank illegally profited from the transactions. Also, as already stated, the trial court had jurisdiction of the subject matter, the parties and the fund in the restitution proceeding, its acts in ordering the disbursement of the money involving merely an *excess* of jurisdiction.

On this issue the principal opinion quotes 18 C. J., sec. 50, p. 778, which says: "The order of the court, although directing payment of the fund to a person not entitled thereto, is an absolute protection to the custodian, and this is true, even in case the order was fraudulently procured, if the custodian had nothing to do with its procurement." The dissenting opinion of HAYS, J., ignores that point. The Superintendent's brief argues the rule applies only to voidable orders and not to those which are *void* for lack of jurisdiction. It is his theory that a void court order is an absolute nullity for any purpose; and that the appellant bank was *presumed to know the law*. And so, he says, since this court in the Aetna *fee* case held the circuit court had no jurisdiction to order the bank to pay out the money, therefore the bank is *personally* liable although that decision was not rendered until long after the money had been disbursed.

As to the effect of void judgments the Superintendent's brief cites United Cemeteries Co. v. Strother, 342 Mo. 1155, 119 S. W. (2d) 762, and other like decisions. That case is a very good example. It had been before the court en banc once previously, United Cemeteries Co. v. Strother, 332 Mo. 971, 61 S. W. (2d) 907, 90 A. L. R. 438. There, a man sought to foreclose a deed of trust on burial grounds and was enjoined. This court en banc unanimously held he could not do it; but that he could be given a preference and paid out of the general assets of the Cemetery Co., which was in receivership. On the second appeal the court en banc changed its view, holding the appointment of the receiver was *void*. Now suppose in the meantime the receiver

had paid money on the mortgage debt or receivership expenses under court orders in accordance with our first opinion. Would it be said the receiver *was presumed to know* our first opinion was wrong; and would he be held *personally* liable for what he had paid out, or would the parties *who got the money* be looked to for restitution? We do not say even they would always be liable. But if the receiver was liable, why shouldn't the same be true of the judges who prompted his action?

The instant restitution proceeding was in equity. The Aetna *fee* case concedes that.[7] In such a proceeding (and doubtless in others) a court register or depositary is not a *trustee* because he is not a free agent but an agent of the court and subject to the direction of the court. Shelley v. Thomas, 232 Ala. 227, 230-1, 167 So. 316, 318-9. In that case a court register had invested registry funds in corporate stock by court order, whereas the Alabama ▮ *constitution* forbid trustees to invest trust funds in that class of securities. After the holding just stated, the decision said:

"While the register is liable for all moneys coming into his hands, yet he is a mere agent of the court, and as such agent he holds the money for the court, and is answerable for any loss of the money by his wrongful acts, but, being an agent of the court, he must disburse the money as the court, his master, directs, and in doing so assumes no personal liability. [21 Corpus Juris, sec. 751, p. 603; People v. Randall, 73 N. Y. 416; Johnson v. Fleming, 116 Ky. 680, 50 S. W. 855.] In fact, if he should refuse to comply with the orders of the court in making distribution of the fund, he could be held for contempt, and punished accordingly. [11 Corpus Juris, sec. 64, p. 884.] This being true, it would be an absurdity to hold him personally liable for complying with the orders of the court, however improvident the orders under which he acted may have been."

In New York City there is a statutory or charter depositary called a Chamberlain. Courts may order impounded funds into his stewardship: (1) either to be retained on deposit; (2) or to be invested wholly or partly, in his discretion; (3) or to be invested in a specified way. It has been said that if and insofar as such Court orders give the Chamberlain a discretion, or if he disregards them, or is negligent in executing them, his duties may be regarded as "similar" or "analogous" to those of a trustee.[8] But the many cases from that state dealing with the personal liability of the Chamberlain base it on disobedience or negligent execution of court orders. They conceded by implication that compliance with the orders in good faith is a complete defense. I say all these cases so hold—there is one exception, Youngs

---

[7]Aetna Ins. Co. v. O'Malley, 342 Mo. 1. c. 816(7), 118 S. W. (2d) 1. c. 10(12). See also: State ex inf. McKittrick v. American Colony Ins. Co., 336 Mo. 406, 424(3), 80 S. W. (2d) 876, 882(4).

[8]Mills v. Bluestein, 275 N. Y. 317, 322, 323, 9 N. E. (2d) 944, 946.

v. Herbert, discussed in the second succeeding paragraph. A distinction is drawn between a trustee and a mere court depositary in a recent Illinois case, Chicago Title & Trust Co. v. Rogers Park Apts. Bldg. Corp., 375 Ill. 599, 607, 32 N. E. (2d) 137, 140-1.

The text of 18 Corpus Juris, sec. 50, p. 778, supra, quoted in the principal opinion, cites People v. Randall, 73 N. Y. 416, as does the Alabama case just reviewed. It is true there was no jurisdictional question in the Randall case. But another case is cited where there was such a question. [In Re McNulty, 123 N. Y. S. 1070.] There, an imposter, posing as C. J., by a forged petition had procured a court order on the court depositary for the payment to her of funds belonging to the true C. J. In other words, the true distributee had not been brought into court, and the court had not acquired jurisdiction over her person for the purposes of the order. Thereafter, the latter made application for the same money. The court held the former court order in favor of the imposter "would seem to be a sufficient protection to him (the depositary) at the time when he acted upon it. It is not claimed that he had anything to do with its procurement, or that he was in any way responsible for the manner in which it was procured, and therefore, upon obeying such order, he was relieved from all further responsibility."

In the interesting series of Youngs cases[9] from New York, one of which is mentioned in the second preceding paragraph, a husband procured an ex parte court order on the depositary for the payment to him of his deceased wife's share as inchoate doweress in certain partition proceeds. The money was paid to him. It was his view that under the law he had succeeded to his deceased wife's share. Her administrator had not been made a party to the proceeding, and later moved to set the order aside on the ground that the money went to the wife's *estate*. The court so ruled and entered final judgment ordering the depositary to pay the money again to the administrator. Its reasoning was that the former order in favor of the husband on its face showed it was not "duly made," as required by a provision of the New York City Charter, because it disclosed the wife was deceased and in that event under the general law the money would go to her estate, not to her husband. The depositary was denied an appeal. He refused to pay the money a second time and was adjudged guilty of contempt.

He was allowed an appeal from the contempt judgment, and the New York Court of Appeals ruled the contempt order must stand because the depositary had had his day in court on the merits

[9]Youngs v. Goodman, 199 App. Div. 281, 192 N. Y. S. 3; Youngs v. Herbert, 202 App. Div. 690, 195 N. Y. S. 476, 478; Youngs v. Goodman, 213 App. Div. 866, 209 N. Y. S. 942; Youngs v. Goodman, 240 N. Y. 470, 148 N. E. 639; Youngs v. Goodman, 214 App. Div. 497, 212 N. Y. S. 407, 409; Youngs v. Goodman, 242 N. Y. 575, 152 N. E. 433; In re Houston's Estate, 145 Misc. 417, 261 N. Y. S. 317, 319.

of the second distribution order, and could not disobey it. But it further held the Appellate Division had erred in holding the wife's share went to her estate instead of her husband, and suggested the case be reopened below for argument on the merits. That was done, the Appellate Division reversed itself and reinstated the order in favor of the husband. But the depositary, though thus vindicated on the merits, *was not purged of the contempt for refusal to obey the erroneous order* in favor of the administrator. By way of history, the Houston case, last in the series, says the erroneous ruling was based on the Charter expression "duly made;" and that after the decision of the above cases the Charter was amended to protect the depositary from liability for payments made by him "in good faith in accordance with the order of the court."

In Succession of Hart, 127 La. 833, 54 So. 46, a court depositary sought to challenge a court order on jurisdictional grounds. The syllabus of the opinion, written by the court, is as follows (italics and parenthesis ours): "A judicial depositary, holding property subject to the order of the court, *has no standing to contest the validity of an order* for the delivery of the deposit to a trust company appointed tutor ad bona (guardian), on the ground that the court has no jurisdiction to make such appointment."

Looking to the rule applicable to *judges* of general jurisdiction, it is said they are civilly liable if they act judicially *wholly* outside their jurisdiction. Some cases declare they are protected when they have jurisdiction alone of the subject matter; others, only when they have jurisdiction both of the subject matter and the person. If they have both and merely *exceed* their jurisdiction in the particular case (which is the situation here) they are not liable. And this immunity exists even when they are *called upon* to decide the question of their own jurisdiction, and decide wrongly.[10] In a case of the latter character, Grove v. Van Duyn, 44 N. J. Law, 654, 659, 42 Am. Rep. 649, the New Jersey Court of Errors and Appeals said:

"The doctrine that an officer having general powers of judicature, must, at his peril, pass upon the question; which is often one difficult of solution, whether the facts before him place the given case under his cognizance, is as unreasonable as it is impolitic. Such a regulation would be applicable alike to all courts and to all judicial officers acting under a general authority, and it would thus involve in its liabilities all tribunals except those of last resort. *It would also subject to suit persons participating in the execution of orders and judgments rendered in the absence of a real ground of jurisdiction.*"

This excerpt (and more) is quoted in Broom v. Douglass, 175 Ala. 268, 276-7, 57 So. 860, 863, 44 L. R. A. (N. S.) 164, 174. The necessary

---

[10] 2 Cooley on Torts (4 Ed.), sec. 315, p. 446; 30 Am. Jur., sec. 45, p. 758, sec. 47, p. 760, sec. 48, p. 761; 33 C. J., sec. 115, p. 982-3, sec. 116, p. 984; Stone v. Graves, 8 Mo. 148, 40 Am. Dec. 131.

implication of the sentence italicised is that if the judge is not liable, the officers of the court who execute his orders also are immune. In Rush v. Buckley, 100 Me. 322, 327, 61 Atl. 774, 776-7, 70 L. R. A. 464, 465, 4 Ann. Cas. 318, 320, the Supreme Judicial Court of Maine thus declared the rule applicable to such officers:

"For reasons founded on public policy, and in order to secure a prompt and effective service of legal process, the law protects its officers in the performance of their duties, if there is no defect or want of jurisdiction apparent on the face of the writ or warrant under which they act. The officer is not bound to look beyond his warrant. *He is not to exercise his judgment touching the validity of the process in point of law;* but if it is in due form, and is issued by a court or magistrate apparently having jurisdiction of the case or subject matter, he is to obey its commands. In such case, he may justify under it, although in fact it may have been issued without authority, and therefore be wholly *void.*" [On a somewhat analogous proposition see State ex rel. Barrett v. Bridges (Mo. App.), 206 S. W. 598, 599(3).]

This Rush case further says the limit of the rule is where the process is void on its face, or where the court or magistrate issuing the process has no general jurisdiction over the subject matter. It has been followed many times in various jurisdictions. Some decisions hold the rule also is inapplicable where there is a plain absence of jurisdiction over the person. Others state a converse general rule that an officer disobeys court orders at his peril unless the lack of initial jurisdiction is obvious and ▮ patent. [Passemore William-son's Case, 26 Pa. 6, 21, 67 Am. Dec. 374; Ex parte Wimberly, 57 Mass. 435, 437.] As has been several times pointed out, the circuit court's basic jurisdiction in the restitution proceeding here was complete. It lacked only jurisdiction to do the particular act of disbursing the fund, because of Sec. 5985, supra.

The paragraph quoted earlier from 18 C. J., sec. 50, p. 778, as to the non-liability of court depositaries, is revised in 26 C. J. S., sec. 9d 1, p. 971. It admits of exceptions where the court order is void on its face, "or with the custodian's knowledge." On the first exception it cites one of the Youngs cases from New York, which we have already reviewed. On the second, Tabor Realty Co. v. Nelson, 49 S. D. 275, 207 N. W. 97, is cited. That decision is as much out of line with the weight of authority as were the Youngs cases, where the New York Charter provision upon which they were based was later amended to cure the injustice worked by their interpretation of it. But even so, the Tabor case did not fasten liability on a court depositary because he was *presumed to know the law.* It was a case where a clerk paid out money in the registry of his court to a litigant on court order, knowing and without informing the court that there was another

claimant to the fund who had not been served with process, and over whom the court consequently had not acquired jurisdiction.

There is good reason for saying the rule should be stricter against a clerk or sheriff attempting to interpret and follow the *general* law in the issuance and service of process, than against an officer who has no independent existence apart from the court, such as a depositary, and whose duty to follow the particular orders of the court is practically absolute. A judicial depositary is often called the *hand* of the court. Can the hand be guilty if the head is not? If a depositary *still has the money*, or is proven fraudulent, negligent or usurpatory, he can be made to pay. But to base his liability on *constructive knowledge of the law*; to require him to be wiser than the court he serves; and to make him the *censor* of that court's orders—such a doctrine is obviously and viciously unsound, would throw all courts into confusion, and expose their officers to intolerable peril. Nothing could be further from those equitable principles which are followed in an action for money had and received. *Leedy, Tipton, Clark* and *Douglas, JJ.,* concur.

HAYS, J. (dissenting).—I do not concur in the principal opinion. This case was argued and submitted in Division I of this court at the January Call, 1941. The case was assigned to BRADLEY, C., for an opinion. In due course he submitted copies of his opinion, reversing the judgment and remanding the cause with directions to enter judgment for the plaintiff. HYDE and DALTON, associate commissioners, concurred in said opinion. Thereafter and in due course he submitted copies of the opinion to the judges of Division I. The opinion was rejected on CLARK and DOUGLAS, JJ., refusing to concur. Thereupon the case was assigned to CLARK, J., for an opinion. In due course he submitted to his associate judges of that division his opinion, which was rejected by HAYS and GANTT, JJ., refusing to concur. Thereupon and on the court's own motion, the case was transferred to the Court En Banc, wherein it was argued, submitted and again assigned to CLARK, J., for an opinion. In due course CLARK, J., submitted his opinion En Banc, which is now the principal opinion in this case. He adopted Commissioner BRADLEY's statement of the facts.

Without undertaking to review the opinion of BRADLEY, C., I adopt it for my dissenting opinion as I deem that, in the main, it is predicated upon sound decisions of this court applicable to the issues in this case, which is impressed with a public interest. However, it is needless to restate the facts of the case for they are correctly stated in the principal opinion. The opinion of BRADLEY, C., on the facts follows:

"The superintendent of insurance, as trustee for the policyholders, was the legal custodian of the restitution money. Sec. 5985, R. S. 1939; State ex rel. Abeille Fire Ins. Co. v. Sevier, 335 Mo. 269, 73

S. W. (2d) 361, 1. c. 368; State ex rel. Garwood Realty Co. v. Dinwiddie, 343 Mo. 592, 122 S. W. (2d) 912; State ex rel. Lucas v. Blair (Mo. Sup.), 144 S. W. (2d) 106, 1. c. 109, and the circuit court had no authority, that is, had no jurisdiction whatever to attempt distribution, hence the circuit court's order directing the deposit of these funds in defendant trust company and the paying out thereof was wholly void. [Aetna Ins. Co. et al. v. O'Malley, 342 Mo. 800, 118 S. W. (2d) 3, 1. c. 9.] In ▮▮▮ the case last cited, the court said: 'When the companies failed to perform their statutory duty, the circuit court had jurisdiction to compel them to do so by adjudging that they pay the excess premiums still in their possession to the superintendent of insurance, or into court for him, but it did not have authority to seize the fund and attempt to administer it through custodians of its own choosing in violation of the statute which provides, in plain terms, that the superintendent of insurance shall administer it.'

▮▮ "Aetna Ins. Co. v. O'Malley, 342 Mo. 800, 118 S. W. (2d) 3, involved the validity of allowances, from the restitution funds, to the custodians, and to their attorney, and it was held that the circuit court was without authority to make such allowances from these funds. And in Aetna Ins. Co. v. O'Malley, 343 Mo. 1232, 124 S. W. (2d) 1164, the same ruling was made as to an attorney employed by the superintendent of insurance with the approval of the Governor. [See also Lucas v. Lamb (Mo. Sup.), 156 S. W. (2d) 634.] It has been consistently held by this court, whenever the question was for decision, that no part of the restitution money could be lawfully paid to any one except to the policyholders who owned it. In the Lamb case it is said:

" 'The record shows that respondent (Lamb) rendered diligent and valuable services, and incurred expense; that his efforts contributed to the collection of a much larger sum for the benefit of the policyholders, or of the state, than might otherwise have been recovered. However, for the reasons stated, we are unable to permit him to retain compensation out of the fund collected.'

"Defendant's president testified that these custodians came to him when the deposit account was started and stated that they desired to make deposit, and delivered to him copies of the two orders of the circuit court made on December 14, 1934; that 'it was thought by us at that time that the money would be returned from the fund to the policyholders', but that 'whatever the cost of administration was, it was presumed that the fund would take care of that.' The second of these orders appears, supra. The first contained a kind of resume of what had occurred theretofore in the 10% reduction order (October 9, 1922). Defendant could not have been ignorant as to the source of the funds deposited, and there is no such claim.

"In the interlocutory judgment (May 26, 1933) for restitution the circuit court appointed four referees, two of whom were the custodians in the present case. Also, in that judgment, the court directed that the

insurance companies deposit $70,000 to pay referees' fees 'and cost and expenses of hearings held by them.' [State ex rel. Abeille Fire Ins. Co. et al. v. Sevier, supra (73 S. W. (2d) 1. c. 369).] And the Abeille case, in addition to holding that the circuit court had jurisdiction to make the restitution order, as stated, supra, held that such court had the power to appoint *three* referees, and not *four*. Also, it was held that there was no authority to support the order to deposit the $70,000 to pay the referees and other costs. The court in that case said (73 S. W. (2d) 1. c. 369) :

" 'It is contended that the court was without power to make the order appointing four referees and requiring relators to make a deposit of $70,000 to pay their fees and the cost and expenses of hearings held by them. The statutes provide that the court may direct a reference in certain specified cases, and may appoint one or more referees, not exceeding three. The case in question falls within the class of cases specified in the statute in which the court would be authorized to direct a reference and appoint the required number of referees, not exceeding three. [Sections 975, 976, and 977, R. S. 1929 (Mo. Stat. Ann., secs. 975-977, pp. 1248, 1249, 1252).] There is, however, no authority for appointing four referees and requiring a deposit to pay their fees and the expenses of hearings held by them, in the face of a statute which limits the number which may be appointed to three.'

"In the brief, defendant quotes, in part, from the Abeille case, as set out, supra, and then says: 'We submit that the first order entered by the circuit court on December 14, 1934, *did nothing more* (italics ours) than order an accounting and appoint two referees, with the duty to make the accounting.' It is true that the first order of December 14, 1934, gave to the custodians powers of a statutory referee as to hearings, etc. Of the power of these custodians, the court, in Aetna Ins. Co. et al. v. O'Malley, supra, said (118 S. W. (2d) 1. c. 10) :

" 'The next question is whether or not Messrs. Cook and Lauf are entitled to compensation as referees. We held in State ex rel. Abeille Fire Ins. Co. ▮ v. Sevier, 335 Mo. 269, 73 S. W. (2d) 361, that the restitution proceeding was the character of case which authorized the court to direct a reference. The order of the court appointing Messrs. Cook and Lauf, by whatever name they were called, constituted them referees with authority to hold hearings for the purpose of determining the amount due from the companies, and to report their findings to the court. *Such was the extent of their authority. The orders of the court which attempted to clothe them with authority to administer* the fund after it was paid into court were void. . . . They were entitled to compensation for services performed as referees, taxable as costs of litigation.' And in the same case it was further stated (118 S. W. (2d) 1. c. 10) : 'For all the reasons stated, the order of the trial court appointing Messrs. Cook and Lauf as custo-

dians *to distribute* said fund to the policyholders, being in violation of Section 5874 (now Sec. 5985, R. S. 1939) was in excess of the court's jurisdiction and void.' (Italics ours.)

"The two orders of December 14, 1934, did not stop at giving the named custodians the powers of an ordinary statutory referee, but in effect, and contrary to defendant's contention, went on (both orders considered together) to authorize the custodians, not only to ascertain the amount to be refunded by each company, but to collect this amount, deposit it with defendant, and under the directions of the court, disburse it to the policyholders, less costs of administration. Defendant, however, says that the direction to disburse was not in the orders of December 14, 1934, but was subsequent and of which defendant had no knowledge.

"The second order of December 14, 1934, set out, supra, recited at its outset that the court had before it the matter of the collection, care, and *disbursement* 'of the fund arising from the order of restitution', and then the order went on to recite, that defendant had been designated as the depository for these funds, and then directed that the depository carry the deposit account on its books under a specified style, and then prescribed exactly how all checks drawn on the fund were to be signed, and directed the custodians to 'keep proper books, showing the amounts received by them, and from whom, and the dates of such receipts, and also showing all amounts paid out, when paid, to whom paid, and for what purpose, which books shall be open at all times to the inspection of the court and its designated agents or officers and to the counsel in the case.'

"Speaking of the opinion in the Abeille case, defendant in the brief, says:

" 'It is apparent that Judge FRANK (author of the opinion) used the term 'administer the fund' and the term 'distribute the fund to the policyholders' as synonymous terms, and we submit that the orders attempting to authorize Cook and Lauf to administer the funds or to distribute the funds to the policyholders were made after the two orders of December 14, 1934, under which two orders the checks were delivered to the trust company for collection and deposit, and under which orders the trust company accepted the deposits. The many other orders made attempting to clothe Cook and Lauf with power to administer or distribute the funds were not only made after the trust company had become the depository, but none of them came to the knowledge of the trust company. That none of such orders came to the attention of the trust company was testified to by Mr. Howard Cook, its president.'

"As we understand, defendant means by *subsequent* orders, the specific court order that was made for each check drawn upon the restitution money. Defendant's president testified: 'Q. Now, from that time on, that is, the 29th day of December, 1934, when this ac-

count was opened in the bank, in the trust company, did you ever receive any other court order of any kind showing any change in the status of the account or in the orders of the court? I am not talking about written orders like a check; I am talking about any order of the court, any court order. A. I don't believe any order was received beyond the certified copies of the two orders referred to. Q. That is what I mean. A. Nothing bearing on the form of the withdrawals from the sum deposited, no, sir. Q. Well, what I am getting at— they talk here about final decrees and interlocutory decrees and all that sort of thing. Were any of those decrees served on you? A. None of them. We had no knowledge whatsoever of any of that record.'

"But whether defendant had or did not have knowledge of subsequent orders as to each separate check, it certainly had knowledge ▇▇▇▇ the matters and things recited in the two orders of December 14, 1934, and from these defendant was bound to know that the circuit court, through its custodians, was going to disburse the restitution funds, and from its own records defendant was bound to know that beginning January 24, 1935, the circuit court and its custodians commenced the disbursement of the restitution money, and defendant is bound to know from its own records that the circuit court and its custodians were not only disbursing to policyholders, but were paying administration expenses from the restitution money.

"Sec. 5874, R. S. 1929, 6 Ann. Stat., sec. 5874, p. 4482, now Sec. 5985, R. S. 1939, among other things, provides that 'during the pendency of such action or review, the orders and directions of the superintendent of insurance, as to reduction of rates, shall be suspended, but all such insurance companies shall, during the pendency of such action or review, deposit with the superintendent of insurance on all policies issued or renewed after the date of such order or direction, and until the final determination of such action, an amount equal to the difference between the rates fixed by the superintendent in his order and those in effect prior thereto, such funds to be held by the superintendent of insurance to await the result of such review, and in the event the orders and directions of the superintendent be set aside, such funds shall be returned to the companies pro rata, and in the event his orders and directions shall be sustained, then such funds shall be turned over to the policyholders pro rata. *The superintendent shall deposit all such funds* (italics ours) so held by him in responsible banks and shall require good and sufficient bond for safekeeping and proper accounting.' This section was in full force and effect when all the deposits here concerned were made, and no one, reading this section, could be mistaken as to who was the lawful custodian of the restitution money.

▇▇▇ "All men are presumed to know the law except when overreached by one possessed of a superior knowledge of the law, or when

there is a relation of trust or confidence. [Security Savings Bank v. Kellems, 321 Mo. 1, 9 S. W. (2d) 967.] Such rule is one of necessity, and is as old as the law itself, and has recognition in the jurisprudence of all civilized countries. Orderly government could not exist if every one at will could interpose his ignorance of the law as a defense when the enforcement of his obligations is sought in the courts. In the present case there is no claim on the part of the defendant that it was *overreached* in accepting the deposit of the restitution money, or that there was any relation of trust or confidence between it and those who placed the money on deposit. Such being the situation defendant must be held to have known when the deposits were made that neither the circuit court nor the custodians had any lawful right to disburse the restitution money. Therefore it must be held, unless all precedent is disregarded, that defendant became a trustee ex maleficio of the restitution money placed with it. There are numerous cases in this State supporting the law as stated. These are a few of such cases: Ralls County v. Commissioner of Finance, 334 Mo. 167, 66 S. W. (2d) 115; In re Cameron Trust Co., 330 Mo. 1070, 51 S. W. (2d) 1025; William R. Compton Co. et al. v. Farmers Trust Co. et al. (Mo. App.), 279 S. W. 746, l. c. 748 (4) ; State ex rel. Gentry v. Page Bank of St. Louis County et al., 322 Mo. 29, 14 S. W. (2d) 597.

"The recent case of Hartford Accident & Indemnity Co. v. Farmers National Bank et al. (Tenn.), 149 S. W. (2d) 473, is similar in principle to the present facts. In that case it appears that one Taylor was clerk and master of the chancery court of Franklin County, Tennessee. He died April 14, 1932, and was found to be short in his account of back tax collections. It was found by the chancery court that Taylor had appropriated to his own use $7,843.14 of the back tax money. His surety, the Hartford Accident & Indemnity Company, paid the shortage, and as the subrogee of the state and county, sued and recovered from the bank in which Taylor had deposited the money. In that case it is said (149 S. W. (2d) l. c. 476) :

" 'The bank's officers knew that the monies in the account 'Dick Taylor, Back Tax' were collections of back taxes. They knew Taylor had no source of income except his office as clerk and master; and they knew he was drawing checks promiscuously on this account for his own individual purposes.'

"In the present case, defendant actually knew the *source* of the money deposited; and presumptively knew that those who deposited it had no lawful right to disburse it, and actually knew that large portions of it were being checked out to persons other than policyholders to whom it belonged. In State ex rel. Gentry v. Page Bank, supra, it is said (14 S. W. (2d) l. c. 599).

" 'There is no question that the bank knew the source of the money deposited with it, and whether or not it perceived and comprehended the constraint of Section 28, Laws 1921, First Extra Session, p. 104,

with respect to the fees made payable to and the prompt transmission thereof to the state treasurer, it was constructively imbued and charged with such knowledge. The secretary of state was a mere collector of the fees, nothing more. The authority given him did not extend to a deposit, and it was his duty to promptly transmit the fees to the state treasurer, to whom they were made payable and under whose control and custody the statute placed them.'

■■■ ''When the first alleged deposit in the present case was made (Dec. 29, 1934), not only was there the statute (Sec. 5985, R. S. 1939) which provided exclusive right to the custody of the excess premium money in the superintendent of insurance and made it his exclusive duty to distribute such money to the policyholders, in case the reduction order was sustained, but there was then the decision of this court (May 31, 1934) en banc in State ex rel. Abeille Fire Ins. Co. et al. v. Sevier, supra, 335 Mo. 269, 73 S. W. (2d) 361, which said in regard to the very proceeding in which the void order here involved was thereafter made, that the excess premium money was the policyholders' money; that (73 S. W. (2d) l. c. 368) 'the super-. intendent of insurance is a public official and represents the policyholders;' that it was his duty 'to get the policyholders their rights under the law;' and that 'neither he nor the attorneys representing him had authority to stipulate away any lawful right of the policyholders.' The court also pointed out in the Abeille case (73 S. W. (2d) l. c. 369) that the insurance companies 'gave a bond payable to the superintendent of insurance for the use and benefit of the policy- holders, guaranteeing to him that they would make such refund.' And further said, 'the superintendent of insurance as the representative of the policyholders, may enforce the reduction order by motion for restitution.'

''The attempt to make the custodians the representatives of the policyholders to collect and distribute this money was clearly in the face of that opinion as well as in violation of the statute, and as stated, both the statute and the opinion existed when the alleged deposits here concerned were made. Furthermore, this court en banc had previously (June 11, 1932) pointed out in State ex rel. Missouri State Life Ins. Co. v. Hall et al., 330 Mo. 1107, 52 S. W. (2d) 174, that our insurance code is exclusive and prevents any court from appointing a receiver of any kind to take over any of the functions vested in the superintendent of insurance by the Legislature in the exercise of its police power to regulate the insurance business and protect the interests of the public therein. This court, in that case, made it clear that the very purpose of the Legislature in providing for a public officer to exercise these designated duties in connection with insurance companies was to prevent (52 S. W. (2d) l. c. 178) 'dissipation of large sums of the company's money for expenses, fees, and allowances' so as to merely leave 'the superintendent as statutory undertaker . . . to distribute the remains.' Statutes for this purpose

were not the result of sudden action, but have a long and well known history behind them. In the situation presented here, it was not possible for the relation of debtor and creditor to be created and the only relation possible, under the facts, between defendant trust company and the superintendent of insurance, the statutory representative of the policyholders, was that of trustee ex maleficio of a public trust fund.

"Defendant invokes Sec. 5458, R. S. 1929, 11 Ann. Stat., sec. 5458, p. 7655, now Sec. 8062, R. S. 1939. This section follows: 'Adverse claim to deposit on books—effectual, when. Notice to any trust company doing business in this state of *an adverse claim* (italics ours) to a deposit standing on its books to the credit of any person shall not be effectual to cause said trust company to recognize said adverse claimant unless said adverse claimant shall also either procure a restraining order, injunction or appropriate process against said trust company from a court of competent jurisdiction in a cause therein instituted by him wherein the person to whose credit the deposit stands is made a party and served with summons, or shall execute to said trust company, in form and with sureties acceptable to it, a bond indemnifying said trust company, from any and all liability, loss, damage, costs and expenses for and on account of the payment of such adverse claims or the dishonor of the check or other order of the person to whose credit the deposit stands on the books of said trust company, provided, that this law shall not apply in any instance where the person to whose credit the deposit stands is a fiduciary for such adverse claimant, and the facts constituting such relationship, as also the fact showing reasonable cause of belief on the part of the said claimant that the said fiduciary is about to misappropriate said deposit, was made to appear by the affidavit of such claimant.'

"This section was enacted in 1927, Laws 1927, p. 246, but it has not been up for construction. Defendant says that this section 'was intended to protect the bank against the very sort of claim that is being pressed here. It was intended to prevent the bank being held liable where a party other than the depositor, with full knowledge of all of the facts, has stood by while the trust company paid out money on the depositor's check, the third person (superintendent of insurance) having made no claim to the funds in accordance with the statute. Unless the whole purpose of this statute is to be nullified by construction, we submit that, in the absence of any affidavit or notice of any kind, the trust company is not liable for funds paid out on checks drawn by its depositor in compliance with the contract of deposit.'

"We cannot agree to such construction. If such was the purpose of what is now Sec. 8062, then it would be possible for any public trust fund to be entirely dissipated, and its rightful owners deprived,

thereof merely because some public officer did not do his duty. This section could not have been intended to apply to public funds, and the decisions of this court en banc throughout the insurance rate fund litigation have applied the rule of public funds, viz., that no neglect or default of any public officer can affect the right of the State, so to speak, to recover such funds. We think that the term *deposit* as used in Section 8062, when applied to the present facts, means what is ordinarily implied by the use of such term, that is, a lawful and proper deposit so far as concerns the *depositor* and the *bank*, and one where the relation of debtor and creditor is created. [See Butcher et al. v. Butler et al., 134 Mo. App. 61, 114 S. W. 564; In re Olson's Estate, 206 Iowa, 706, 219 N. W. 401; City of Canby v. Bank of Canby, 192 Minn. 571, 257 N. W. 520; State Banking Board et al. v. James et al. (Tex.), 264 S. W. 145.] Also, there was in fact, no *adverse* claimant as to *ownership* of the restitution money. Defendant, the custodians, and the circuit court all recognized that the money actually belonged to the policyholders.

"See also State v. Weatherby, 344 Mo. 848, 129 S. W. (2d) 887, l. c. 892, where it is said: 'What we have said disposes of defendant's point that he need not take notice of any limitation on the powers of the state auditor in auditing the account. He had actual knowledge of the facts involved and he received payment under statutory provisions which every person was bound to know and construe at his peril.'

"In the present case, it was the duty of those who collected the restitution money to turn it over to the superintendent of insurance, and this the defendant bank must be held to have known. There can be no escape from the conclusion that defendant is liable for the money sued for, and we so rule.

"Is plaintiff entitled to recover interest, and if so, should interest run only from date of demand, October 17, 1938? We think plaintiff is entitled to recover interest. [See Sec. 3226, R. S. 1939, 7 Ann. Stat., sec. 2839, p. 4623; Napoleon Hill Cotton Co. v. Stix, Baer & Fuller Dry Goods Co., 203 Mo. App. 25, 217 S. W. 323; Jefferson City Savings Assn. v. Morrison, 48 Mo. 273; Great Northern Ry. Co. v. Erie Ry. Co., 58 Fed. (2d) 414.] As stated, supra, this is an action for money had and received. Sherman v. International Life Ins. Co., 291 Mo. 139, 236 S. W. 634, was an action for money had and received, and it was held in that case (236 S. W. 1. c. 642) that in order to recover interest it was necessary to allege and prove demand. Such was done in the present case. Sec. 3226, R. S. 1939, referred to, supra, provides as follows:

"'Creditors shall be allowed to receive interest at the rate of six per cent per annum, when no other rate is agreed upon, for all moneys after they become due and payable, on written contracts, *and on accounts after they become due and demand of payment is made*; for money recovered for the use of another, and retained without the

owner's knowledge of the receipt, and for all other money due or to become due for the forbearance of payment whereof an express promise to pay interest has been made.' (Italics ours.)

"It was held in the Sherman case, supra, that the part of Sec. 3226 which we have italicized was applicable as to interest in that case, and we perceive of no reason why such part of said section should not control here, hence we hold that plaintiff is entitled to interest only from date of demand, and we might say that there are suits in judgment ▆▆▆ and pending which involve parts of the same money sued for in this cause. Lucas v. Lamb, supra, is one of these suits. Plaintiff, of course, will be entitled to only one satisfaction of the judgment presently to be directed.

"The judgment should be reversed and the cause remanded with directions to enter judgment for plaintiff for the sum of $289,789.95, plus simple interest at 6% from October 17, 1938, date of demand. It is so ordered."

### OPINION ON MOTION FOR REHEARING.

CLARK, J.—Appellant has filed a motion for rehearing divided into eighteen numbered sections. The first seventeen of them relate to matters which have been twice briefed and argued in this Court and fully discussed in our opinions on file.

▆▆▆ In the eighteenth subdivision of the motion, appellant seeks to raise a Federal question by contending that our decision is so palpably wrong as to constitute a denial of due process and equal protection as guaranteed by the Fourteenth Amendment to the Constitution of the United States. This is ultimately a question for the United States Supreme Court. We have no desire to pass upon it further than is necessary in ruling on appellant's motion for rehearing here. We find no error in our principal and concurring opinions, and therefore overrule this assignment in the motion.

▆▆▆ In this connection appellant refers to our exclusion of the opinions of two of the judges. He does not ask that these opinions be ordered filed nor does he clearly explain just how their exclusion is related to the point under discussion.

On our right to exclude the opinions, appellant's argument may be summarized as follows: that our constitution and statutes require all opinions to be filed; that until an opinion is filed it is not before the court for consideration; and that, since we did not find that the excluded opinions consist entirely of improper matter, we should have excluded only the offensive portions.

It is unnecessary to decide whether there is any legal requirement that a concurring or dissenting opinion be filed. It has been and is the custom to permit the filing of such opinions. That custom is a wise one and has always been, and will continue to be, adhered to by this court provided such opinions do not transcend the bounds of

propriety. In the instant case a dissenting opinion by one of our judges has been filed and will be published in the official reports.

If appellant is correct in his assumption that an opinion is not properly before the court for consideration until it has been filed in the clerk's office, then no opinion has ever been legally adopted by this court. It has been the unbroken practice of this court to submit copies of proposed opinions to the judges before conference, and to consider them in conference before they are filed in the clerk's office. That practice was followed in the instant case. Two opinions were considered and voted on in division one, but neither was filed because each failed to receive a carrying vote. The majority opinions in this case were considered in conference before being filed. We believe that the same, or a similar, practice prevails in every appellate court in this country.

Appellant concedes (pages 35 and 37 of the motion) that "the right to strike *after* filing has ample authority to support it," but argues that, even then, we should strike only such portions as contain improper matter.

The duty of courts to keep their records free from being made the vehicle and repository of scandal and abuse is universally recognized. Many cases could be cited in which courts have performed this duty by excluding from the record offensive or improper matter contained in pleadings, briefs or other documents. It has seldom been necessary to exclude the opinion of a judge, but in Nadeau v. Texas Co., 104 Mont. 558, 69 Pac. (2d) 593, 111 A. L. R. 874, the Supreme Court of Montana expunged an opinion of its Chief Justice because it was said to be "scandalous, scurrilous and defamatory." Usually the offensive paper has been filed before the court has an opportunity to pass upon it, but in some instances courts have exercised the power to prevent the filing of such papers. In Wenborne-Karpen Dryer Co. v. Cutler Dry Kiln Co., 292 Fed. 861, a United States Circuit Court of Appeals, on its own motion, denied the filing of a motion for rehearing because: "The form of criticism adopted, and the manner in which what may fairly be called accusations are made, are not in accord with the code of professional manners hitherto recognized in this court." Certiorari to review this case was denied by the United States Supreme Court. [263 U. S. 708, 68 L. Ed. 517, 44 Sup. Ct. 36; see also People ex rel. Allen v. Murray, 22 N. Y. S. 1051.]

The filing of a scandalous paper permits the dissemination of the scandal under unmerited privilege, while it remains on the record, and thereby causes harm which is not entirely cured by striking such paper from the record. This is especially true as to the opinion of a judge for, no matter how malicious or unjustified it may be, the injured person ordinarily has no redress. We think it is the duty of the court, when possible, to prevent the filing of such paper rather than to wait until it has been filed and then strike it out. Nor do we

feel that we can strike out a part only of a judge's opinion for that would, in effect, be writing an opinion for him. In State ex rel. Term. R. R. Assn. v. Hostetter, 342 Mo. 859, 119 S. W. (2d) 208, we held that we will not edit the opinion of a judge of one of our courts of appeal.

Running through appellant's motion is the thought that by the exclusion of the opinions we arbitrarily prevented a free expression of the judges who wrote them. This is unwarranted. Our order shows that we had previously requested, and continued to request, each judge to write freely, frankly and without limitation within the issues of the case. Nor did our order purport to impinge upon the right of free speech under the law. Section 14, Article II, of our Constitution, provides "that every person shall be free to say, write or publish whatever he will on any subject, being responsible for all abuse of that liberty." If an excluded opinion contain no improper matter, as specified in our exclusion order, its author, or any one else, as a private citizen, may freely publish it; if either of the excluded opinions can not stand this test, then it was properly excluded from the court records and from publication in the official reports.

Our order, after reciting that the separate dissenting opinion of one named judge, the separate answer of another and the separate reply of the first "contain matter which is scandalous, impertinent and scurrilous, patently outside the record of the case, and irrelevant and unnecessary to any view of the law which is, or is asserted to be, applicable hereto," continues as follows:

"The Court acknowledges its duty to keep its files and records free from scandalous and defamatory statements neither pertinent to the case nor necessary to its decision. At the same time the Court hereby confirms the right of any member of the Court to express himself by judicial opinion freely, frankly and without limitation within the issues of the case and has earnestly requested and continues to request each of the members of this Court above mentioned so to do. Nothing in this order shall be construed as preventing such members of this Court from exercising as private citizens the same full freedom of speech as may be exercised by any citizen of this State."

Then the order provides that the designated opinions "all as now written be neither lodged nor filed with the Clerk of this Court nor become records of this Court and the same stand expunged. For support of this action see Nadeau v. Texas Co., 104 Mont. 558, at 572, 69 Pac. (2d) 593, 111 A. L. R. 874, and cases cited therein. And in re Ledyard's Will, 261 App. Div. 827, 24 N. Y. Supp. (2d) 780."

We feel that the publication of the excluded opinions would be the surest vindication of our action in excluding them, but we can not aid in their circulation under privilege by permitting them to be filed. If application is made to the Supreme Court of the United States for review of this case, the parties have leave to stipulate that the excluded

opinions, with the consent of their authors, may be submitted to that court under the safeguards provided in the case of In re Ledyard's Will, supra.

The motion for rehearing is overruled. *Leedy* and *Douglas, JJ.*, and *Ellison, C. J.*, concur; *Tipton, J.*, concurs in first, second and last paragraphs; *Hays, J.*, dissents; *Gantt, J.*, absent.