RAY B. LUCAS, Superintendent of the Insurance Department of the State of Missouri, Appellant, v. CENTRAL MISSOURI TRUST COMPANY, a Corporation.—No. 37667.—166 S. W. (2d) 1053.

Division Two, November 12, 1942.

Rehearing Denied, January 4, 1943.

*Roy McKittrick,* Attorney General, *Covell R. Hewitt* and *Harry H. Kay,* Assistant Attorneys General, for appellant; *Charles L. Henson* of counsel.

596

*W. T. Ragland* and *Chas. H. Mayer* for respondent; *Ragland, Otto & Potter* and *Conkling & Sprague* of counsel.

 BARRETT, C.—This is an action by the Superintendent of the Insurance Department of the State of Missouri against the Central Missouri Trust Company of Jefferson City. The purpose of the suit is to recover the specific sum of $133,411.14 of the $1,798,911.12 impounded 16 2/3 per cent increased insurance premium funds which were deposited in the defendant bank. The $133,411.14 was withdrawn from the bank by checks on orders of the Circuit Court of Cole County for the purpose of compensating the court's custodian of the fund, the then circuit clerk, his attorney, stenographic and clerical help, stationery and supplies, rent for an office and other expenses incurred in carrying out the orders of the court in administering or handling the fund.

Though we are unable to balance the sums as set forth in the plaintiff's brief, from which we make this statement of the facts, $250,000.00 of the total fund was withdrawn and deposited in the Exchange National Bank of Jefferson City, $175,000.00 was withdrawn and deposited in the Commerce Trust Company of Kansas City and $7,086.83 was withdrawn to make refunds to certain of the insurance companies, who collected the fund, on account of policy cancellations. The balance of the total fund, $1,226,986.53, including $1,688.86 interest paid by the defendant, was turned over to the plaintiff for distribution to people who had been compelled to pay the increased premiums.

As we have stated, the sum involved in this suit, $133,411.14, represents withdrawals, by checks written on the order of the court, from the deposited 16 2/3 per cent increased and impounded insurance premiums collected between January 1, 1930, and April 19, 1937. The theory of the plaintiff's right to recover is that the Circuit Court of Cole County had no jurisdiction of the principal case, the so-called review case, and no jurisdiction to administer the impounded fund and its deposit of the fund in the defendant bank was illegal and that by accepting the deposited fund the bank became a trustee ex maleficio of the fund because it was deposited and accepted with constructive knowledge on the part of the bank that the court was acting unlawfully. In short, the plaintiff's position is that the bank was bound to know the court did not have jurisdiction to order the fund deposited and, therefore, accepted the deposit in violation of law and the relationship of debtor and creditor did not arise as between the bank and the court or its custodian.

The facts upon which the plaintiff relies as entitling him to recover may be summarized as follows:

In December, 1929, the fire insurance companies doing business in Missouri promulgated a 16 2/3 per cent increase in their rates, which the then Superintendent of Insurance denied or refused to approve. The companies, on June 5, 1930, then filed, in the Circuit Court of Cole County, a proceeding or case to review the order of the superintendent. The purpose of that suit was to get the order of disapproval set aside. The insurance department answered and was a party to the suit throughout its history.

As soon as the suit was filed the circuit court made an order which recited that the filing of the suit operated as a stay as to the superintendent's actions and required the impounding and deposit with the superintendent of the difference in the increased rates and the former rates. The order directed the superintendent to deposit the funds in the Central Missouri Trust Company and the Exchange National Bank of Jefferson City. This procedure was followed until January, 1933. In the meantime the court made various orders with reference to the fund; it permitted the acceptance of different security

for the deposits by the insurance department, permitted deposits in any one of five named banks and changed the rate of interest to be paid on the deposits.

In January, 1933, the Central Missouri Trust Company and the Exchange National Bank filed a motion or petition in the Circuit Court of Cole County, in the original review case, asking the court to review and construe its previous orders with reference to the funds and especially to restrain the superintendent from withdrawing the funds from the banks until further order of the court. The superintendent filed an answer admitting most of the allegations contained in the motion, but stated that the impounded funds should be distributed to the lawful owners and prayed for an order of distribution accordingly.

After a hearing, the court, on its own motion, ordered the superintendent to pay all the funds in his hands to the court, as well as all subsequent premiums received and to make reports of collections. The order designated three banks as depositories, provided for security for the deposits and the payment of interest on them. The deposits were carried on the books of the bank under the heading:

"Circuit Court of Cole County, Missouri, Special Fund. American Constitution Fire Assurance Company et al. v. Joseph B. Thompson, Superintendent of the Insurance Department of the State of Missouri."

The respondent bank received the deposits under this and subsequent court orders, complied with the orders by giving security and paying interest as long as the court required it and the law permitted paying it. The court's order recited that all previous orders regarding the fund had been made on the mistaken assumption that the handling of the funds was governed by Section 5874, R. S. Mo. 1929, of the insurance laws.

In February, 1936, the Circuit Court again reviewed its previous orders pertaining to the impounded funds and appointed Guy M. Sone, the Circuit Clerk, custodian of the funds, under the direction of the court. The order fully directed the clerk as to his duties as custodian and provided that he should be compensated, in addition to his regular salary, for handling the fund.

All checks drawn on the fund, including the withdrawals in question, were in conformity with the court's orders, countersigned by the court and signed:

"Guy M. Sone As Custodian of Impounded Funds on Behalf of the Circuit Court of Cole County, Missouri, in American Constitution Fire Assurance Company, et al. v. R. E. O'Malley, Superintendent of Insurance of Missouri, No. 6344."

After the principal case, the review case, was decided by the Supreme Court of Missouri in 1938 the bank filed a petition or motion in the circuit court asking permission to deliver the funds on deposit, as above set forth, to the Superintendent of the Insurance

Department. Eventually the funds were delivered to the superintendent and the circuit court ordered them distributed to policyholders who had paid them.

Many other facts which materially bear on the case could be stated, but we believe this synopsis of the plaintiff's statement will suffice. As the plaintiff says, he seeks here to require the bank to account to him as legal custodian of the funds the sum of $133,411.14 which was not returned to him but was paid out on orders of the Circuit Court of Cole County.

As far as we have been able to discover, this is the twenty-first case in the Missouri courts involving the fire insurance rate litigation which began in 1922. These cases readily divide themselves into two classes; those involving the 10 per cent rate reduction promulgated by the Superintendent of Insurance in 1922 and those involving the 16 2/3 per cent increased rates promulgated by the fire insurance companies doing business in Missouri at that time, 1929. Both the plaintiff and the defendant rely on these previous cases, especially the increased rate cases, as substantiating their respective claims of liability and non-liability.

Chronologically the 10 per cent reduction cases are Aetna Insurance Company v. Hyde (1926), 315 Mo. 113, 285 S. W. 65 (Aetna Insurance Company v. Hyde, 275 U. S. 440, 48 S. Ct. 174, 72 L. Ed. 357) ; State ex rel. Hyde v. Westhues (1927), 316 Mo. 457, 290 S. W. 443; Aetna Insurance Co. v. Hyde (1929), 34 Fed. (2d) 185 (National Fire Insurance Co. v. Thompson, 281 U. S. 331, 50 S. Ct. 288, 74 L. Ed. 881) ; Aetna Insurance Company v. Hyde (1930), 327 Mo. 115, 34 S. W. (2d) 85; State ex rel. Abeille Fire Ins. Co. v. Sevier (1934), 335 Mo. 269, 73 S. W. (2d) 361; Aetna Insurance Co. v. O'Malley (1938), 342 Mo. 800, 118 S. W. (2d) 3; Aetna Insurance Company v. O'Malley (1939), 343 Mo. 1232, 124 S. W. (2d) 1164; State v. Weatherby (1939), 344 Mo. 848, 129 S. W. (2d) 887; State ex rel. Robertson v. Sevier (1939), 345 Mo. 274, 132 S. W. (2d) 961; Lucas v. Lamb (1941), 348 Mo. 900, 156 S. W. (2d) 634, and Lucas v. Central Missouri Trust Co. (1942), 349 Mo. 537, 162 S. W. (2d) 569.

The cases involving the validity of the 16 2/3 per cent rate increase and the fund produced by it are State ex rel. N. British & M. Ins. Co. v. Thompson (1932), 330 Mo. 1146, 52 S. W. (2d) 472; State ex inf. McKittrick v. American Colony Ins. Co. et al. (1935), 336 Mo. 406, 80 S. W. (2d) 876; State ex rel. Thompson v. Sevier (1935), 336 Mo. 442, 80 S. W. (2d) 893; State ex rel. Penn. Fire Ins. Co. v. Sevier (1937), 340 Mo. 675, 102 S. W. (2d) 882; American Const. Fire Assur. Co. v. O'Malley (1938), 342 Mo. 139, 113 S. W. (2d) 795; State ex rel. Robertson v. Sevier (1938), 342 Mo. 346, 115 S. W. (2d) 810; American Constitution Fire Ins. Co. v. Robertson (1938), 343 Mo. 198, 120 S. W. (2d) 43; State ex rel. Carwood Realty Co. v. Dinwiddie (1938), 343 Mo. 592, 122 S. W. (2d) 912; State ex rel.

Lucas v. Blair (1940), 346 Mo. 1017, 144 S. W. (2d) 106, and the instant case.

It has been thought that each case would be the last and absolutely exhaustive of the possibilities of further insurance rate litigation, but as time passes new fields open and now, novel and conflicting interpretations are placed on the former opinions of this court and every sentence is seized on as declaring some rule of law determinative of the new issue. At the risk of further confusion and further conflicting interpretation (and, solely for the purpose of this case), but considering only the points really involved, we summarily state the result of the cases as we understand them.

The 10 per cent reduction ordered by the superintendent was lawful and justified on the facts. The 16 2/3 per cent increase by the companies was unlawful and not justified on the facts. The insurance code, Art. 8, Ch. 37, R. S. Mo. 1939, 6 Mo. St. Ann., pp. 4474-4484, contemplates that there will be a fund to impound in rate reduction cases but not in rate increase cases. The fund resulting from the collection of the increased rates was illegally collected. The insurance code specifically makes the Superintendent of the Insurance Department the custodian of impounded funds resulting from rate reductions. There is no statute specifically applicable to funds arising from rate increases because the statute does not contemplate a fund from that source, but we have held that if any such fund does come into existence it belongs to the policyholders who paid the premiums and can only be returned to them. We have held the Superintendent of the Insurance Department to be the proper custodian of that fund, but that only the Circuit Court of Cole County (not the Supreme Court nor the Circuit Court of Boone County) had jurisdiction to order restitution of the fund. The Circuit Court of Cole County, however, had no jurisdiction to administer the impounded funds nor to order fees paid from them to his custodian, the custodian's lawyer nor for other purposes. Neither did the Insurance Department nor the Attorney General have power to employ counsel to be paid from the impounded insurance premiums. Though his powers were not delimited one way or another this court did say that the Circuit Court of Cole County had the inherent power to protect the illegally collected funds.

Relying particularly on that portion of the above cases holding that the Circuit Court had no jurisdiction to administer the impounded funds and that the Superintendent of Insurance was the proper custodian of them the plaintiff argues that the defendant's acceptance of the deposits constituted it a trustee ex maleficio and that, therefore, it is liable for honoring the checks drawn on the fund under the orders of the court. Lucas v. Central Missouri Trust Co., 349 Mo. 537, 162 S. W. (2d) 569, involves similarly withdrawn deposits made on the impounded reduction funds but differs from the instant case in

that it is an action in seventy-five counts for money had and received for each check drawn on the account.

The plaintiff makes no effort to develop its theory of liability and recovery other than merely to say that the defendant's acceptance of the deposits under the circumstances constituted it a trustee ex maleficio and that it is, therefore, liable for that part of the deposits spent and withdrawn by the court and its custodian, consequently it is necessary for us to determine what the terms "trustee ex maleficio" and "trust ex maleficio" mean.

"Ex maleficio" has been defined variously as "from or growing out of wrongdoing; tortious; tortiously," Ballentine, Law Dictionary, p. 469; "Growing out of, or founded upon, misdoing or tort," Black, Law Dictionary, p. 451, and "On account of misconduct. By virtue of or out of an illegal act," 1 Bouvier, Law Dictionary, p. 1103. In plain English "ex maleficio" is probably synonymous with "malfeasance." And "malfeasance" is "The doing of an act which a person ought not to do; evil conduct; an illegal deed;—often used of official misconduct or an instance of it. Contrast with 'misfeasance,' 'nonfeasance,' " Webster's New International Dictionary, p. 1489; "Evil doing; the doing of that which ought not to be done; wrongful conduct, especially official misconduct; violation of a public trust or obligation; specifically, the doing of an act which is positively unlawful or wrongful, in contradistinction to misfeasance, or the doing of a lawful act in a wrongful manner," 6 Century Dictionary, p. 3593.

"Trustee ex maleficio" is "A trustee from wrongdoing; the trustee of a trust arising by operation of law from a wrongful acquisition," Ballentine, Law Dictionary, p. 1304; "A person who, being guilty of wrongful or fraudulent conduct, is held by equity to the duty and liability of a trustee, in relation to the subject matter, to prevent him from profiting by his own wrong," Black, Law Dictionary, p. 1178 and "One who, by reason of his own wrong or fraud in acquiring property, is regarded as holding it as a trustee for the purpose of rectifying the wrong," Cyclopedic Law Dictionary, p. 1126. Our own courts have never defined the terms "trustee ex maleficio" or "trust ex maleficio" but have simply used them to describe or characterize certain acts or conduct as giving rise to or creating such a status. For example, "The fraudulent conduct of respondent in taking this title in his own name, in repudiating the agency, in violating the terms of the agency and in seeking to speculate off of his principal, may well create a trust in him as to the real estate in question, placing it in a class of trusts spoken of in the books as trusts ex maleficio." Harrison v. Craven, 188 Mo. 590, 610, 87 S. W. 962; 42 Words & Phrases, p. 630. "A trust ex maleficio arises on account of fraud or misconduct of the trustee in taking title, or by virtue of some illegal act upon his part." William R. Compton

Co. v. Farmers Trust Co., 220 Mo. App. 1081, 279 S. W. 746; Elliott v. Landis Machine Co., 236 Mo. 546, 139 S. W. 356.

As a matter of fact the better authorities on the subject of trusts do not use the words "trustee ex maleficio" or "trust ex maleficio." We are unable to find either phrase in the Restatement of the Law of Trusts, the Restatement of the Law of Restitution or in Scott on Trusts. In truth if these terms are to be classified or catalogued in any branch of the law they describe that conduct giving rise to a "constructive trust." "The main problem in the field of constructive trusts is the cataloguing of the types of inequitable conduct which have been sustained as bases for the constructive trust." 3 Bogert, Sec. 471, p. 1455. While Professor Bogert does not recognize "trust maleficio" as constituting a branch of the substantive law of trusts he does speak of it: "There are many synonyms for the constructive trust. It is very frequently called a trust 'ex maleficio' or 'ex delicto' because it is based on the wrongful conduct of the trustee. Other authorities lay emphasis on the lack of any intention on the part of the trustee to be such, and call this a trust 'in invitum' or an 'involuntary' trust." 3 Bogert, Trusts, Sec. 471, p. 1454. "Constructive trusts are also called trusts ex maleficio, trusts ex delicto, trusts in invitum, or involuntary trusts. Trusts ex maleficio. One growing out of fraud, misdoing or tort. These trusts are sometimes termed ex delicto or trusts in invitum." 65 C. J., Sec. 14, pp. 224-225.

Therefore, in its final analysis, the fundamental basis of the plaintiff's theory of recovery is that the deposits were made under such circumstances that a constructive trust arose. *"Where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it, a constructive trust arises."* Restatement, Restitution, Sec. 160, p. 640. "The constructive trust may be defined as the device used by chancery to compel one who unfairly holds a property interest to convey that interest to another to whom it justly belongs. When a court of equity finds that a defendant is the holder of a property interest which he retains by reason of unjust, unconscionable, or unlawful means, it naturally desires to take such interest from the defendant and vest it in the wronged party. This it might do by merely making a decree that the defendant convey to the complainant. But the court must take account not only of the original situation, but also of all the events which have occurred since the defendant began to hold inequitably. . . . It must express the idea that the defendant has been under an equitable duty to give the complainant the benefit of the property ever since the defendant began to hold unjustly." 3 Bogert, Trusts, Sec. 471, pp. 1451-1453; Scott, Trusts, Sec. 462; Kerber v. Rowe, No. 37,637, 348 Mo. 1125, 156 S. W. (2d) 925. And so here the problem is whether or not the defendant's conduct was such as to call for the

application of the equitable remedy designated a constructive trust. Has the defendant unjustly enriched itself in such a manner that it should make restitution to the plaintiff and those he represents?

The insurance department does not plead that there was any fraud on the part of the bank in accepting the deposits or in honoring checks drawn on the account by the court in payment of the items complained of. Neither does it charge the court with fraud in making the withdrawals or the deposits. In fact the only language in the record characterizing any ▆▆▆ of the acts of the parties is in the plaintiff's argument which says: "In the case before this Court, the Circuit Court of Cole County was the wrong-doer when, upon solicitation by the respondent bank, said court took away the impounded funds from the legal custodian thereof. When the bank allowed said funds to be deposited in the name of said wrong-doer, to wit, the said Circuit Court, a trust ex maleficio resulted in favor of the owner of said impounded funds, to wit, the Superintendent of Insurance as trustee for the policyholders." We do not intend to say that it is necessary to characterize the conduct of anyone connected with the suit, nor to condone it, but there is no allegation or evidence of such wrongful, tortious or fraudulent conduct on the part of the bank as to call for the application of the equitable remedy of a constructive trust. "An exhaustive analysis would show, I think, that all instances of constructive trusts properly so called may be referred to what equity denominates fraud, either actual or constructive, as an essential element, and as their final source." 4 Pomeroy, Equity Jurisprudence, Sec. 1044, p. 94; Young v. Kansas City Life Insurance Co., 329 Mo. 130, 43 S. W. (2d) 1046; Ferguson v. Robinson, 258 Mo. 113, 167 S. W. 447. One of the most frequently quoted statements is Mr. Justice Cardozo's: "A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." Beatty v. Guggenheim Exploration Co., 225 N. Y. 380, 386, 122 N. E. 378; 3 Scott, Trusts, Sec. 462. The fund was illegally collected in the first place. It belonged to the policyholders from whom it was collected and in that sense was a trust fund. The Circuit Court of Cole County exceeded its authority in attempting to administer the fund and in ordering part of it paid to a custodian, a lawyer and for other purposes and yet we are unable to find any circumstance or law which in justice or equity makes the bank liable for the withdrawals.

Aside from some of this court's previous statements that the Circuit Court of Cole County could do certain things with the fund and aside from the question of the court's power to deposit the funds in the court's registry during their collection, they were not deposited in direct violation of a positive statute. There was no misappropriation by the bank and so far as the record is concerned no partici-

pation by the bank in any unlawful scheme to get control of the funds or assist some fiduciary in "milking" the fund. We can see nothing immoral or inequitable in the respondent's appealing to the circuit court for directions or even to ask for the deposit—the plaintiff once appealed to the Circuit Court of Boone County for directions. "There are three ways in which a bank may incur liability and be compelled to make good deposits that have been misappropriated by a fiduciary: (1) By a violation on its part of the contract, express or implied, between it and the owner of the fund; . . . (2) by appropriating the fund, either with or without the fiduciary's consent, to the payment of the latter's debt to the bank; . . . and (3) by assisting the fiduciary to accomplish the misappropriation, the bank having knowledge, actual or constructive, that the fraud is being or about to be perpetrated by the fiduciary; the reason for the bank's liability is that it knowingly makes itself a party to a fraud, and must make good the loss that results from the misappropriation." 7 Am. Jur., Sec. 517, pp. 371-372; L. R. A. 1915C, p. 518; Bank of Giles County v. Fidelity & Deposit Co., 84 Fed. (2d) 321; Lloyds Ins. Co. of America v. Moberly (Mo. App.), 82 S. W. (2d) 139; 5 Michie, Banks & Banking, Sec. 56b, pp. 124-125.

In its final analysis the basis of the plaintiff's case is that liability for the withdrawals results because the circuit court was held to be without jurisdiction to make the orders it did make with reference to the deposits and the withdrawals. In other words there being no jurisdiction the deposits were unlawful and the defendant was bound to know that fact and consequently is liable for honoring the checks drawn on them by the one who made them. The question is, assuming all this to be true, is it such conduct as to create or call for the application of that equitable remedy a constructive trust?

In West St. Louis Trust Co. of St. Louis v. Brokaw, 232 Mo. App. 209, 102 S. W. (2d) 792, a next friend recovered a judgment of $2,000.00 for a minor and as a part of its judgment the circuit court made specific orders and directions as to the disposition of the proceeds, among other things the money was ordered deposited in the West St. Louis Trust Company. The deposit was made in the next friend's name as trustee and the deposit sheet stated that no withdrawals could be allowed without a court order. Checks were drawn and paid on the account and interest was credited to it. The bank failed and a preference was sought on the theory that the bank was a trustee ex maleficio. The Court of Appeals held that the circuit court acted beyond and outside the scope of its jurisdiction in attempting to control and administer the fund after the judgment was satisfied. In determining whether or not the bank's acceptance and retention of the deposit was such a wrongful act on its part as to amount to a misappropriation the court said, l. c. 796:

"But even though the court did go outside its jurisdiction in directing the next friend to deposit the money in the bank to be held

by the bank upon the terms and conditions specified in the court's judgment, we do not think that the bank's acceptance and retention of the deposit constituted it a trustee ex maleficio so as to entitle the present claim to be accorded priority of payment.

"The order of the court having been void, the actual situation was the same as though no such order had ever been made. It constituted no authority for the making of the deposit, but the fact that the order was void could not of itself have rendered the transaction with the bank unlawful. If the same was wrongful and unlawful, it was only so because, the status and character of the parties considered, no such deposit could lawfully have been made.

"Now it is not at all unlawful, with nothing more appearing, for a bank to accept a general deposit of funds belonging to a minor and being held for the minor's benefit by one who designates himself as trustee. . . . In other words, to give rise to a trusteeship ex maleficio on the part of a bank in accepting and retaining such a deposit, the transaction must be of such a character as to constitute an unlawful investment of the ward's money, in which transaction the bank participates with full knowledge of all the material facts and circumstances, including the limitation fixed by statute with respect to the power and duty of the guardian or curator."

This case illustrates that the fact of who made the deposit and the jurisdiction or lack of jurisdiction of the court in ordering it has but little to do with resulting liability on the part of the bank. If the money had been deposited by the Superintendent of Insurance and then partially withdrawn on court orders to pay the department's employed counsel or the items in question, the problem, on the plaintiff's theory, would remain. As a matter of fact it is not lack of jurisdiction in the court to administer the fund that is complained of but wrongful withdrawals of the deposits, that is, using the money for an unlawful or illegal purpose.

It will be observed that there is a material difference in the Brokaw case and the instant case. There it was sought to establish a preference for the balance of the unlawfully deposited fund while here the plaintiff attempts to go a step further and seeks to impose liability for that part of the fund which has been withdrawn, not by the bank, but by the court and the custodian depositing it. The problem here is analogous to that presented in Rodgers v. Bankers National Bank, 179 Minn. 197, 229 N. W. 90, where a trustee in bankruptcy embezzled funds he had deposited in a bank not designated as a depository. Liability was asserted on the theory that the bank had constructive notice that under the terms of the Bankruptcy Act it was not a designated depository. The court pointed out that a preference might result for funds constructively or actually received with knowledge that they were deposited in violation of a statute but said, 179 Minn. l. c. 211-212, 215:

"This is not a case to impress a trust upon funds in the possession of the bank. *The funds are gone. This action seeks to impose a personal liability upon the bank, because of an alleged violation of its duty.*" So, where a station agent deposited funds in his personal account and embezzled them and the railroad sought to impose personal liability on the bank the court in Atlanta & St. A. B. Ry. Co. v. Barnes, 95 Fed. (2d) 273, 275, said:

"When, however, the bank is sought to be held, not for what it has that belongs to another, but to pay that other what the bank did not retain but which still others got, the result is very different, and so ought the applicable principles to be."

Consequently, when funds were placed in a regularly appointed depository bank to the credit of certain specific bankruptcy cases by a United States District Court but the deposits were exhausted on court orders in payment of fees and expenses in cases for which there had been no deposits it was held that the bank was not liable. State National Bank v. Dodge, 124 U. S. 333, 31 L. Ed. 458, 8 S. Ct. 521. Although the point was not discussed it is suggested that the court had no jurisdiction to order payments in cases in which there were no funds. And, when one without authority purported to act as an executor and deposited funds and converted them it was held the bank was not liable for the withdrawn deposits. Holden v. Farmers & Traders Nat. Bank, 77 N. H. 535, 93 Atl. 1040, L. R. A. 1915E, p. 309.

State ex rel. Elberta Peach & Land Co. v. Chicago Bonding & Surety Co., 279 Mo. 335, 215 S. W. 20, was a suit on a receiver's bond. There a corporate receiver took possession of funds and converted them and his surety contended that since the bank had knowledge of the nature of the fund and that the receiver had no authority to use it personally the bank was liable for the withdrawals, consequently there was no loss to the principal. But, as the court observed, 215 S. W. l. c. 24:

"The equitable doctrine of following a trust fund has no application to this case. The assets of the bank have not been enriched to the extent of relator's loss. The fund is not in the bank. Haydel withdrew and appropriated it to his own use. The only theory upon which it can be held that the bank is liable to relator is that of aiding in, and thereby becoming a party to, the conversion of the fund."

And, so it is in the instant case, the funds were withdrawn though the depositor had no authority to make either the deposit or the withdrawals, and yet liability should not be imposed on the bank on the theory of unjust enrichment in the absence of allegation and proof that it was a party to the wrongful withdrawals, got part of the funds or was a party to a scheme by which someone else was to receive the benefits of the unlawful withdrawals.

Relying on certain preference cases, particularly State ex rel. Gentry v. Page Bank of St. Louis County et al., 322 Mo. 29, 14 S. W. (2d) 597, and Huntsville Trust Co. v. Noel, 321 Mo. 749, 12 S. W. (2d) 751, the appellant confidently asserts that if this were a preference case there would be no doubt as to its outcome. We do not have such a case before us and therefore cannot pass on it but aside from the fact that in all the cases cited the deposits were in direct violation of a positive statute there is one other difficulty with such a statement. Even in Missouri which has been most liberal in allowing preferences on the theory of a constructive trust imposed on the general assets of a bank it is necessary to show that the bank's assets were augmented by the deposit. Of course, if they are conclusively shown to have been withdrawn without any malfeasance or conduct on the part of the bank calling for the application of the equitable remedy of a constructive trust there can be no preference. The theory of a preference is that the cestui is "being given back only his own property, the title to which he has never lost." The theory is that the property in some form is there—in the bank—augmenting its assets; in other words, unjustly enriching someone other than the true owner. Porterfield v. Farmers Exchange Bank, 327 Mo. 640, 37 S. W. (2d) 936; In re Mt. Vernon Bank, 334 Mo. 549, 66 S. W. (2d) 850; 82 A. L. R. 46, 123, 176.

The fact that the deposits were trust funds and ordered deposited by the court does not in and of itself entitle them to a preference. "In the absence of express statute, a trust or preference has in almost all of the cases been denied as to money deposited in a bank or trust company by a court, or pursuant to its order, or by an officer thereof." 86 A. L. R. 209.

In addition to the specific items comprising the withdrawn $133,411.14 the plaintiff alleged that the defendant bank made a profit out of and by reason of the deposit of the impounded insurance premiums and asked judgment against it for that sum. If it was not unlawful for the bank to accept the deposit in the first place it necessarily follows that the bank is not liable for any profit resulting from the deposit, at least on the theory of being a trustee ex maleficio. But aside from the question of whether or not it is or would be liable for any profit it may have made the plaintiff made no effort upon the trial of the case to prove what that profit was or even that the bank did gain from the deposit itself. The president of the bank did testify that the bank made a profit during the years the deposits were there and that as deposits of the insurance premiums were made securities, aggregating in value the deposits, were segregated or purchased and the earnings from such securities were credited to the bank. However, no effort was made to connect the earnings directly with the deposits and there was no offer to prove the amount of any earnings even if such earnings would unjustly enrich the bank so as to give rise to a constructive trust.

The judgment of the trial court in favor of the defendant is affirmed. *Westhues, C.,* not sitting; *Bohling, C.,* concurs.

PER CURIAM:—The foregoing opinion by BARRETT, C., is adopted as the opinion of the court. All the judges concur.