PAUL L. CHESTER *v.* STATE OF MARYLAND

[No. 1117, September Term, 1975.]

*Decided September 15, 1976.*

The cause was argued before POWERS and MENCHINE, JJ., and RICHARD M. POLLITT, Associate Judge of the First Judicial Circuit, specially assigned.

*George L. Russell, Jr.,* for appellant.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *John Henry Lewin, Jr., Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MENCHINE, J., delivered the opinion of the Court.

Paul L. Chester (appellant), an elected Clerk of the Court of Common Pleas, went to trial before a jury in the Criminal Court of Baltimore under indictment 17401949 (Rasin, J., specially assigned, presiding). Initiated as a three count indictment, the State entered a *nolle prosequi* as to the second count prior to commencement of trial. At the conclusion of the State's evidence a Motion for Judgment of Acquittal as to the third count was granted. The jury convicted under the first count and the appellant was sentenced to fine and imprisonment.

On appeal, appellant makes the following contentions:

"I. The Special Prosecutor Was Appointed Illegally.

II. Denial Of Access To Grand Jury Minutes Was Unwarranted.

III. The Evidence Was Insufficient To Support A Charge Of Malfeasance In Office.

IV. Submission Of Count One To The Jury After Dismissal Of Counts Two And Three Was Error."

## I.

### *The Prosecutor*

On November 27, 1974, the State's Attorney of Baltimore City filed a petition requesting the court to appoint "an Assistant State's Attorney" pursuant to the Annotated Code of Maryland, Courts and Judicial Proceedings Article, § 2-102. On the same date twelve judges then assigned to and serving in the twelve parts of the Criminal Court of Baltimore, by joint order appointed John Henry Lewin, Jr., Esquire, as "Assistant Counsel for the State for the purpose of prosecuting the [Chester] case with full powers authorized under the laws of Maryland." Under the signature of each of the said judges there was typed "JUDGE CRIMINAL COURT OF BALTIMORE."

Appellant contends that Mr. Lewin's appointment and subsequent service as assistant counsel for the State constituted reversible error. He maintains: (a) that appointment to such an office must be made by the Supreme Bench of Baltimore City — not by the Criminal Court of Baltimore; (b) that the failure to accord him notice and hearing prior to the appointment denied him due process under the Maryland and United States Constitutions; (c) that an order passed by the Chief Judge of the Court of Appeals on November 22, 1974 designating [1] the Honorable George B. Rasin, Jr. (who was not a signatory to the

---

1. Authorized by Maryland Constitution Article IV, § 18A; Maryland Rule 1202 a. 1.

appointment order) to preside as the trial judge in the case, operated to deprive the other judges of the Criminal Court of the power to appoint assistant counsel in that case; and (d) that Mr. Lewin was qualified to act as assistant counsel for the State only during the regime of the Honorable Milton B. Allen as State's Attorney, his authority terminating as a matter of law with the qualification of the successor State's Attorney.

### (a) *The Appointment*

The case of *State v. Ensor and Compton,* 277 Md. 529, 356 A. 2d 259, is dispositive of this contention. The judges of the Criminal Court of Baltimore possessed the power to appoint assistant counsel for the State.

### (b) *Due Process*

One accused of crime has no constitutional right to notice or hearing upon the question of who shall prosecute the case against him, when the assigned prosecutor regularly was appointed pursuant to a valid general law.

### (c) *The Designation of Judge Rasin*

The designation of Judge Rasin in pertinent part authorized him ". . . to sit, either alone or with one or more other Judges, as a Judge of the Supreme Bench of Baltimore City assigned to the Criminal Court of Baltimore in the case of *State of Maryland v. Paul L. Chester . . . ."*

The order of designation neither diminished the powers of the other judges assigned to the Criminal Court of Baltimore nor limited essential judicial action in the case exclusively to Judge Rasin.

### (d) *Duration of the Appointment*

The appointment of Mr. Lewin was stated to be "for the purpose of prosecuting the [Chester] case with full powers authorized under the laws of Maryland." The statute authorizing passage of that order plainly intended the powers of such an appointee to extend through the completion of the assigned duty. The fact that a change in

the office of the State's Attorney occurred subsequent to the passage of the court order in no way attenuated its legal effect.

## II.

### Grand Jury Minutes

On June 11, 1975, approximately four weeks prior to the commencement of trial, counsel for appellant filed a Motion for Disclosure of Grand Jury Minutes. The motion, after asserting that such Minutes were "needed for the purposes of impeaching and/or testing the credibility of key prosecution witnesses," alleged: (a) that "all the testimony bearing on the alleged unlawful acts will be concerning numerous private meetings and conversations over many months"; (b) "That from the posture of the case it is rather obvious that such key prosecution witnesses have already committed perjury"; and (c) "That a 'particularized need' for disclosure has been shown, as more fully set forth in the accompanying Memorandum of Law." [2]

In *Silbert v. State*, 12 Md. App. 516, 280 A. 2d 55 (1971), cert. den. 263 Md. 720, Chief Judge Murphy (now Chief Judge of the Court of Appeals of Maryland) for this Court collected and discussed the cases dealing with the circumstances under which grand jury transcripts will be required to be disclosed to an accused. After pointing out that a "particularized need" must be demonstrated before access to grand jury minutes may be had, Judge Murphy declared that the issue "is one of fact to be decided in each case; there is and can be no general test." Id. at 523, 280 A. 2d at 60.

We shall examine the record to determine whether a "particularized need" has been shown. It appears from the record that the State, pursuant to an order of the trial judge, filed in the proceedings a bill of particulars of the first count of the indictment reading in pertinent part as follows:

"1. The names of those persons whom the State contends were the subjects of Defendant's attempt

---

2. The memorandum of law contained no further recitation of facts to support a "particularized need."

to coerce and intimidate are: Roland Keller, Peggy J. Washington, Patricia Bertorelli, John Wankmiller, Francis Sherry, Randall Carroll, Arthur Sindler, Nicholas Possidente, Lolita Fales, Genevieve Salfner, John Henry Winkler and Krystal Marie Garner Halloway.

2. The circumstances under which the State contends that Defendant engaged in the conduct and acts charged are a meeting held at approximately 4 p.m. on January 11, 1974 in his office on the first floor of the Courthouse at which time Defendant made some of the statements which are described generally in the State's Answer to Item 2 of Defendant's Motion for Discovery."

Moreover, the record shows that upon application of the appellant, the trial judge, *inter alia,* required the State (a) to furnish the names and addresses of the witnesses against him whom the State intended to call to prove its case in chief; [3] (b) to furnish the defendant with the substance of the alleged oral statements attributed to the defendant; [4] and (c) to furnish the defendant with all evidence whether verbal or written which is exculpatory in nature.[5]

It was manifest that all of the witnesses disclosed in the State's bill of particulars and in the State's answer to the discovery motion were available for interviews by the appellant prior to trial. There is no substantial departure by the witnesses from the particularization of the events as recited in the State's bill of particulars, or answer to Motion for Discovery. The witnesses at trial were sequestered. Extensive cross-examination produced neither substantial

---

**3.** The State's answer listed the names and addresses of 17 persons, of whom eight ultimately were called as witnesses for the State.

**4.** The statement detailing the alleged comments of the appellant at the office meeting on January 11, 1974 was substantially as recited *infra* in the summary of the testimony of the witnesses under Part III hereof.

**5.** The State's answer listed the names and addresses of five employees of the clerk's office who had claimed "either (a) that Defendant did not make the oral statements generally described in answer to Item 2 herein, (b) that they do not recollect or recall Defendant having made said statements, or (c) that if said statements were made, it was not heard because (1) the listener was not paying attention, (2) the listener's mind 'phased off' or (3) said oral statement did not concern the listener."

conflict in the testimony of any witness individually nor substantial disagreement in the totality of the testimony of all witnesses *inter sese*. No witnesses were called in behalf of the appellant. In sum, the evidence of what was said and done by the appellant is without contradiction.

Claim to a "particularized need" requires delineation of the facts tending to support the contention. Something more must be shown than mere surmise or speculation that the testimony of a witness at trial may be inconsistent with his testimony before the grand jury. In the subject case no factual base supporting the claim has been shown.

In such circumstances, what we said in *Grimm v. State*, 6 Md. App. 321, 331-32, 251 A. 2d 230, 236-37 (1969), cert. den. 255 Md. 741 (1969), U. S. cert. den. 397 U. S. 1001 (1970), is particularly applicable here:

> "Finally, appellant contends that the trial court erred in denying his motion for the production of the Grand Jury testimony of Sergeant Louis Roemer. The contention appears based on the proposition that Roemer's testimony at trial revealed that he was the only witness who testified before the Grand Jury and that his testimony was insufficient to justify the indictment. Appellant claims that he was therefore seriously prejudiced by his inability to impeach Roemer at the trial through use of his testimony before the Grand Jury.

> "It is the well settled rule that the competency of testimony before the Grand Jury will not be inquired into by the courts and the alleged insufficiency of such evidence is no ground to dismiss an indictment. *Costello v. United States*, 350 U. S. 359; *Pick v. State*, 143 Md. 192; *Wilson v. State*, 4 Md. App. 192. Equally well settled is the proposition that there is no absolute right to inspect the testimony of a witness before a Grand Jury. *Dennis v. United States*, 384 U. S. 855; *Pittsburgh Plate Glass Company v. United States*, 360 U. S.

395. At the very most, *Dennis* makes clear that it is only upon a showing of a 'particularized need' that an accused might be entitled in a proper case to such disclosure. See *Wilson v. State, supra* (Footnote 10), and *Chesley v. State,* 3 Md. App. 588 (Footnote 7). We think the trial judge was entirely correct when, in denying appellant's motion, he said:

> "* * * there is no showing in this case of any particularized need nor anything about this case that would bring it within the exception. If this defendant is entitled to a transcript of the Grand Jury proceedings then I cannot think of any criminal cases, be it felony or misdemeanor, where a defendant could not obtain the Grand Jury testimony, and that is not the law of Maryland.' "

*See also: Sutton v. State,* 25 Md. App. 309, 334 A. 2d 126 (1975).

We perceive no error.

### III.

#### *Sufficiency of the Evidence*

There was evidence from which the jury could find:

That Paul Chester, elected Clerk of the Court of Common Pleas, in January 1974 called a meeting of the clerical staff of his office in room 140 of the Court House in Baltimore City. After preliminary comments about office policy respecting absenteeism and tardiness, he advised the group that he was running for re-election; that he intended to win the election and that he expected his employees to purchase $150 worth of tickets for a political fund raising affair. He indicated disappointment with his employees' response to an earlier fund raising attempt and declared that he would not be undermined from within. He terminated the meeting with a statement to the effect that he would be in office after the next election and that if the clerks did not cooperate they would not be, and declared that an earlier

memorandum that he circulated to the employees indicating that nothing would happen to the clerical staff by reason of the forthcoming election "was strictly for the press, television and radio."

Appellant contends that an essential element of the offense charged is a showing that the misconduct of a public officer related solely to the conduct of official matters or interfered with the administration of his public duties and responsibilities. From this premise he argues that where "no direct interference with public duties has been proven, even if the conduct in question constitutes criminal behavior, the public official, albeit responsible for his acts, has not, however, committed the crime of malfeasance."

His principal reliance for that position stems from the decision of the Superior Court of Pennsylvania in the case of *Commonwealth v. Blatstein*, 332 A. 2d 510 (1974), wherein the Court said at 515:

> "In order to show misconduct in office, it is not sufficient to show that Blatstein solicited or even accepted a bribe. The commonwealth must demonstrate that Blatstein followed the course of conduct which the bribe sought to secure. As Professor Perkins has said:
>
>> 'The corrupt *receipt* of a bribe by an officer, for example, is criminal misconduct of one *while* in office, but such a *recipient* is clearly not acting in the exercise of the duties of his office, nor is this wrongful act under color of his office, and bribery has always been recognized as a separate offense. In fact, if an officer corruptly *receives* a bribe and then corruptly *does* what he has been bribed to do, he is guilty of both bribery and misconduct in office.' (Emphasis added.) R. Perkins, Criminal Law 482 (1969).
>
> Since proof of solicitation of a bribe does not necessarily entail proof of misconduct in office, the Commonwealth had to show that Blatstein acted upon his offer to Sherry in advising the committee.

In failing to do so, which the Commonwealth virtually admitted at trial, it failed to prove that Blatstein was guilty of misconduct in office. The Commonwealth having failed in its proof of this necessary, additional element, the lower court erred when it dismissed appellant's motion in arrest of judgment on the indictment charging malfeasance, misfeasance and nonfeasance in office."

A quite different view of the offense was taken in *Wallace v. State*, 211 A. 2d 845 (S. Ct. Del., 1965), wherein the Court said at 850-51:

"The crime of malfeasance in office is intended to deter public officers acting in their official capacities from committing corrupt and unlawful acts in disregard of the high standard of integrity to which such officers are held by virtue of the fiduciary nature of their duties. To hold, as the defendant contends, that there was no evidence of malfeasance in this case simply because there was no evidence of wrongful performance of a required official act, i. e., the casting of a vote, would be to take an unduly narrow view of malfeasance in office. Sufficient evidence to support a charge of malfeasance is presented when it is shown that the defendant has committed an unlawful act and such act may affect or is connected with his official duties. State ex rel. Martin v. Burnquist, 141 Minn. 308, 170 N. W. 201, 609 (1918); State ex rel. v. Ward, 163 Tenn. 265, 43 S.W.2d 217 (1931)."

The late Judge Ogle Marbury, speaking for the Court of Appeals of Maryland, in *State v. Carter*, 200 Md. 255, 89 A. 2d 586 (1952), discussed in considerable depth the common law offense of misconduct in office, in the course of which he said at 262, *et seq.* [589]:

"The indictment in this case is captioned: 'Malfeasance in Office', but as the Court of Appeals of Georgia has well said in a similar situation: ' * * * it is well established by numerous decisions

of the Supreme Court and this court that the *name*
of a crime given in an indictment does not
determine the offense alleged to have been
committed by the accused, but the offense is
determined by the facts stated in the indictment.'
*Cargile v. State.* 67 Ga. App. 610, 21 S. E. 2d 326,
327. Nearly one hundred years ago (1855), the
Supreme Judicial Court of Massachusetts
announced the following definitions, with its
authority therefor: 'Nonfeasance is the omission of
an act which a person ought to do; misfeasance is
the improper doing of an act which a person might
lawfully do; and malfeasance is the doing of an act
which a person ought not to do at all. 2 Inst. Cler.
107. 2 Dane Ab. 482. 1 Chit. Pl. (6th Amer. ed.) 151.
1 Chit. Gen. Pract. 9.' *Bell v. Josselyn*, 69 Mass. 309,
311, 3 Gray 309, 311. These are the definitions
which, with some enlargement, seem to run
through all of the text books and cases. See *Words
and Phrases*, Permanent Edition, Vol. 26, p. 139, et
seq., Title, Malfeasance, and Vol. 28, p. 722, et seq.,
Title, Nonfeasance, and the numerous cases cited
which make the same distinction. In *Webster's
International Dictionary*, 2nd Edition, malfeasance
is defined as: 'The doing of an act which a person
ought not to do; evil conduct; an illegal deed; —
often used of official misconduct or an instance of
it.' Misfeasance is defined as: 'The doing wrongfully
and injuriously of an act which a person might do
in a lawful manner; the doing of a lawful act in
an unlawful manner, or the wrongful and injurious
exercise of lawful authority.' The State contends
that malfeasance carries with it the connotations of
wilfulness, evil intent or motive, and corruption,
and cites a number of cases to support this view,
but all of these cases contain in one form or another
the definitions above mentioned. *Carlisle v. Burke*,
82 Misc. 282, 144 N. Y. S. 163, 164. *State, ex rel.
Knabb v. Frater*, 198 Wash. 675, 89 Pac. 2d 1046.
*Lucas v. Central Missouri Trust Co.*, 350 Mo. 593,

166 S. W. 2d 1053, 1056. *State v. Bolitho*, 103 N. J. L. 246, 136 A. 164, 172. *State, ex rel. Hardie v. Coleman*, 115 Fla. 119, 155 So. 129, 92 A. L. R. 988. It is undoubtedly true that the doing by a public official of an act which he ought not to do carries with it some measure of wilfulness and bad intent, and may be induced by corrupt motive, but these are only necessary or probable accompaniments. They may also accompany the doing of a lawful act unlawfully, which is misfeasance. The test seems to be in the nature of the act, and not in the motive by which it is done.

"The cases in this court do not always call misconduct in office by either one of the two terms, malfeasance or misfeasance, but when they do use the words, they seem to recognize the distinction. In *Consolidated Gas Co. v. Connor*, 114 Md. 140, 78 A. 725, 32 L. R. A., N. S., 809, a civil case, nonfeasance and misfeasance are given the usual definitions above mentioned. *Hiss v. State*, 24 Md. 556, was an indictment against a justice of the peace. A defendant had been brought before this officer, accused of stealing bank notes. He was searched and certain bank notes were taken from him and delivered to the justice. The justice, however, refused to turn them over to the person entitled to them, and the indictment said that this was done 'unlawfully, wilfully, oppressively, corruptly, and in violation and contempt of his duty'. The court there held that all the elements of crime were enumerated in the indictment and upheld it, but it did not describe the crime charged by any particular name. It said: 'It is immaterial whether the law imposed upon him the duty to receive the property, (of which we express no opinion,) it was received by him, under color of his office, if not *"virtute officio"*, and there can be no doubt of his legal obligation to restore it to the person entitled.' (24 Md. 562.) The court expressly

declined to decide, as immaterial, whether the defendant was doing something he had a right to do, unlawfully, or whether he was doing something which he had no right to do at all."

Although *Blatstein, supra,* cited a portion of its text to support the decision, Perkins Crim. Law 2d Ed.-UTB, at 482-83, in dissertation upon the common law offense makes clear that its impact is wide ranging and comprehensive:

## "D. MISCONDUCT IN OFFICE (OFFICIAL MISCONDUCT)

The prevention of outside influences tending toward corruption is not the only social interest in the official action of public officers. It is socially desirable, so far as reasonably possible, to insure that no public officer shall, in the exercise of the duties of his office *or while acting under color of his office,* (1) do any act which is wrongful in itself — malfeasance, (2) do any otherwise lawful act in a wrongful manner — misfeasance, or (3) omit to do any act which is required of him by the duties of his office — nonfeasance. And any corrupt violation by an officer in any of these three ways is a common-law misdemeanor known by some such name as 'misconduct in office' or 'official misconduct.'

\* \* \*

## 1. UNDER COLOR OF OFFICE

The mere coincidence that crime has been committed by one who happens to be a public officer is not sufficient to establish official misconduct. For this offense it is necessary not only that the offender be an officer, or one who presumes to act as an officer, but the misconduct,

if not actually in the exercise of the duties of his office, must be done under color of his office. On the other hand *the act of one who is an officer, which act is done because he is an officer or because of the opportunity afforded by that fact, is under color of his office* despite his gesture of removing his badge plus his statement that he is not acting in the name of the law." (Emphasis added; Footnotes omitted.)

Hochheimer, Crimes and Criminal Procedure 2d Ed., also emphasizes the breadth of the offense, saying at § 383:

## "MALFEASANCE AND MISCONDUCT IN OFFICE

§383. *General Doctrines.* — Any act or omission in breach of official duty *and any act of oppression under color of official authority by any public officer is, as a general rule, punishable as a misdemeanor.* 'Public officer' means any one holding employment or appointment under the government. A *de facto* officer is a public officer within the meaning of this section. An officer is not, however, punishable for the acts of his deputies or subordinates in which he does not participate.

The following acts and omissions of public officers are misdemeanors: neglect or non-performance of any positive duty imposed by law; *oppressive and wilful abuse of authority* (to be distinguished from mere error of judgment); extortion; fraud or breach of trust affecting the public, such as rendering, passing or procuring false accounts, or wilfully neglecting to account for money received, or corruptly retaining money found upon a prisoner; grossly indecorous conduct, such as sitting as a justice while drunk, or getting drunk during time of service as a grand juror." (Emphasis added; Footnotes omitted.)

*Elrod v. Burns,* 427 U. S. 347 (1976), 44 L. W. 5091, although not precisely apposite serves to illustrate the basic impropriety of the course of action followed by the appellant. In *Elrod,* the Supreme Court of the United States held that threats to discharge non-merit system employees of a county sheriff for the sole reason that they were not affiliated with or sponsored by the party of the newly elected sheriff, was inpermissible action. Indeed, the plurality opinion by Mr. Justice Brennan (Justices White and Marshall concurring) urged that constitutional limitations forbade resort to such a course, saying at 355-56 [5094]:

> "Since the average public employee is hardly in the financial position to support his party and another, or to lend his time to two parties, the individual's ability to act according to his beliefs and to associate with others of his political persuasion is constrained, and support for his party is diminished.
>
> "It is not only belief and association which are restricted where political patronage is the practice. The free functioning of the electoral process also suffers. Conditioning public employment on partisan support prevents support of competing political interests. Existing employees are deterred from such support, as well as the multitude seeking jobs. As government employment, state or federal, becomes more pervasive, the greater the dependence on it becomes, and therefore the greater becomes the power to starve political opposition by commanding partisan support, financial and otherwise. Patronage thus tips the electoral process in favor of the incumbent party, and where the practice's scope is substantial relative to the size of the electorate, the impact on the process can be significant."

The plurality opinion went on to say at 359-60 [5095]:

> "Patronage practice falls squarely within the

prohibitions of *Keyishian* [6] and *Perry*. [7] Under that practice, public employees hold their jobs on the condition that they provide, in some acceptable manner, support for the favored political party. The threat of dismissal for failure to provide that support unquestionably inhibits protected belief and association, and dismissal for failure to provide support only penalizes its exercise. The belief and association which Government may not ordain directly are achieved by indirection. And regardless of how evenhandedly these restraints may operate in the long run, after political office has changed hands several times, protected interests are still infringed and thus the violation remains."

The concurring Justices (Stewart and Blackmun) although declining to adopt the constitutional limitation, said at 375 [5099]:

"The single substantive question involved in this case is whether a nonpolicy making, non-confidential government employee can be discharged from a job that he is satisfactorily performing upon the sole ground of his political beliefs. I agree with the Court that he cannot."

Although Clerks of Court have a considerable constitutional autonomy, Maryland Constitution Article IV, §§ 25 and 37, the employment of deputy clerks is not a matter directed to a Clerk's discretion. In *State, use of Smith v. Turner*, 101 Md. 584, 61 A. 334 (1905), it was said at 590-91 [337]:

"There is no discretion as to the employment of deputy clerks. Under the 26th section of Art. 4 of the Constitution, the duty to appoint is imperative. There is no absolute discretion as to whom the clerk shall appoint. He can appoint no one without the approval of the Judge of his Court, nor can he

6. Keyishian v. Board, 385 U. S. 589 (1967).
7. Perry v. Sindermann, 408 U.S. 593 (1972).

retain him if found by the Judge to be incompetent or negligent, and the only reason for these provisions is that the proper performance of the duties of the office, so many of which can only be performed with due promptness by the aid of deputies, may be guaranteed to the public. He cannot appoint a greater number of deputies than the Court deems necessary for the discharge of the duties of the office, and he cannot refuse to appoint such number as the Court may require. He cannot himself fix and limit the salaries to be paid to his deputies, but must allow such as the Comptroller of the State shall determine to be just and proper. The manifest purpose of this provision is to prevent the wrongful absorption of the receipts of the office by excessive salaries on the one hand, and to secure the services of competent persons by the assurance on the other hand of just and reasonable compensation. In no clerk's office in the State would it be possible for the clerk unaided to perform all the clerical work when and as it should be done for the protection of the public, and it was this consideration which caused the framers of the Constitution to embody in that instrument the duty of appointing deputies, and the power of confirmation and supervision conferred upon the Court. Deputies are not mere servants or agents of the clerk; they are agents and officers of the Court, being appointed, in the language of the Constitution, 'to perform together with (the clerks) themselves the duties of the said office.' "

*See also*: Maryland Constitution Article IV, § 26.

The Clerk of Court occupies a particularly sensitive position of public trust. The proper administration of his office entails the closest relationship and cooperation of his staff with the courts themselves. Public confidence in the even and equal administration of justice will be eroded unless the highest standards of official conduct are

recognized and heeded by judges and the agents and officers of the court alike.

We are persuaded that the described actions of the appellant making demand for political contributions and coupling that demand with the threat of discharge from office unless that demand is met, fall within the boundaries of the common law offense of misconduct in office. We have no doubt that the conduct ascribed to the appellant by the witnesses is calculated to affect the efficient operation of the clerk's office and to destroy the indispensable insulation of the courts from political activity. The threat itself is the gravamen of the offense, its implementation not an essential. The evidence was legally sufficient to convict.

IV.

*Submission of Count One to the Jury*

Appellant contends that actions taken in the trial court upon counts two and three of the indictment compel reversal of the conviction under count one. Resolution of the question requires recitation of the material language of the several counts.

Count one, after reciting that appellant was elected, qualified and acting as Clerk of the Court of Common Pleas, alleged that appellant "while acting under color of the said office, unlawfully, wilfully, corruptly, knowingly, contemptuously and improperly . . . did unlawfully obligate certain employees in the said office of the Clerk of the Court of Common Pleas [a] to contribute money to his political campaign for re-election to said office and render political services to him in connection with his said campaign for re-election to said office. . . . and [b] did unlawfully engage in acts and conduct for the sole purpose of coercing and intimidating certain employees in the said office of the Clerk of the Court of Common Pleas to contribute and donate goods, materials, services and monies to his campaign for re-election to the Clerkship of the said Court of Common Pleas, . . ." The count went on to state that the two allegations were in violation of Code Article 33, § 28-1 and Code Article 27, § 562A, respectively.

Count two charged that the accused had violated Article 33, § 28-1 subsection C.[8]

Count three charged that the accused had violated Article 27, § 562A.[9]

The pre-trial *nolle prosequi* as to the second count was declared by the State to have been entered because the subsection "fails to state a criminal offense under Maryland law." Such an entry as to one count of an indictment does not bar prosecution under another. *Williams v. State,* 7 Md. App. 241, 245, 254 A. 2d 376, 378 (1969), cert. den. 256 Md. 749 (1970).

The trial court granted the motion for acquittal as to the third count upon the ground that "this Court cannot find that this evidence supports the facts that there was a political association or organization involved in the election of the Defendant, and the Court does not believe that this

---

**8.** Article 33, § 28-1. reads as follows:

"Participation in politics or political campaigns and the free expression of political opinions by employees of this State or of any county, municipal corporation, city, political subdivision, public authority, body political or board of education shall not be prohibited, and each employee shall retain all rights and obligations of citizenship provided in the Constitution and laws of the State of Maryland, and in the Constitution and laws of the United States of America; however, no such employee shall:

    (a) Engage in political activity while on the job during working hours;
    (b) Advocate the overthrow of the government by unconstitutional and violent means; or
    (c) Be obligated to contribute or render political service."

**9.** Article 27, § 562A. reads as follows:

"(a) *Prohibited acts.* — It is unlawful for any person, group or organization to engage in any act or conduct for the sole purpose of coercing or intimidating another person to contribute or donate any goods, materials, services, or moneys to any social, economic, or political association or organization.

(b) *Labor picketing not prohibited.* — Nothing herein shall be deemed to prohibit any picketing assembly in connection with a labor dispute as that term is defined in Article 100, § 74 of the Annotated Code of Maryland (1964 Replacement Volume), title 'Work, Labor and Employment,' subtitle 'Injunction, as amended from time to time.

(c) *Penalties.* — Any person found guilty of violating this section shall be punished by a fine of not more than $100 or by imprisonment for not more than 90 days or both. Each day in which a violation of this section occurs constitutes a separate offense. (1972, ch. 721.)"

language is sufficiently descriptive to include an individual who is soliciting contributions from others for election." Otherwise stated, the trial judge granted the motion for acquittal as to the third count because he believed that there had been a failure of proof as to one of the necessary elements of the statutory offense. That decision having been favorable to the accused, its correctness is not before us. Accordingly, we shall assume, without deciding, that an essential element of the *statutory* offense was lacking. Nonetheless, the grant of the motion for acquittal as to the third count did not affect the validity of the conviction as to the first count. The missing element of the *statutory* offense was not a *necessary* element of the *common law* offense.

There is not the slightest indication that the legislature, by the passage of Article 33, § 28-1, subsection C or Article 27, § 562A, intended to eliminate or to amend the common law offense of misconduct in office. The allegations of fact contained in the first count of the indictment are sufficient to constitute a charge of common law misconduct in office.

Under quite similar circumstances, it was said in *Lutz v. State*, 167 Md. 12, 17, 172 A. 354, 357 (1934):

> "It follows that, as the first count of each indictment describes an offense cognizable at common law, and since that law as to that offense has not been repealed, and since each count concludes 'against the peace, government and dignity of the state,' the demurrers to them were properly overruled. The additional allegation in the Lutz case that the offense charged was against the form of the statute may be disregarded as surplusage."

In the subject case also, the allegation that the offense charged was in violation of Article 33, § 28-1, subsection C and of Article 27, § 562A properly may be disregarded as surplusage. The first count sufficiently charged a *common law* offense. The proof was legally sufficient to support the charge.

*Judgment affirmed.*
*Costs to be paid by appellant.*